Leese v. Clark.

---

LEESE v. CLARK *et al.*

A PREVIOUS ruling of the appellate Court upon a point distinctly made, is only authority in other cases, to be followed and affirmed, or to be modified or overruled, according to its intrinsic merits; but in the case in which it is made, it is a final adjudication, and constitutes upon a new trial or a second appeal, the law of the case.

The Supreme Court has no appellate jurisdiction over its own judgments; it cannot review or modify them after the case has once passed, by the issuance of the remittitur, from its control. When a new trial is ordered, and the order is based upon a decision determining the principles of law which govern the action, that determination is no less final and conclusive in regard to the points passed upon, than is a decision which leads to the affirmance of a judgment. The new trial must be conducted in accordance with the principles thus determined; and when thus conducted, no error can be alleged in the action of the Court below.

This doctrine applies equally to actions of ejectment, as to actions of any other character, and is not affected by the public nature of the questions involved, or by any considerations as to their general importance.

Leese *v.* Clark.

The decision in this case on the former appeal, (18 Cal. 535) considered and approved.

A patent of the United States issued to a confirmee of a Spanish or Mexican grant, under the Act of Congress of March 3d, 1851, treated simply as the deed of the United States, is in its operation like the deed of any other grantor, and passes only such interest as the United States possessed—the deed taking effect by relation at the date of the presentation of the petition of the patentee to the Board of Land Commissioners. But such patent is not merely a deed of the United States ; it is a record of the Government—of its action and judgment with respect to the title of the patentee existing at the date of the cession of California—and as such record is conclusive evidence of title in the patentee at the time the jurisdiction of the subject passed from the Mexican Government to the United States.

The acquisition of California by the United States did not affect the rights of the inhabitants to their property. The inhabitants retained all such rights, and were entitled, by the law of nations, to protection in them to the same extent as under the former Government. And independent of the obligations thus arising, the United States, by the treaty of Guadalupe Hidalgo, in effect stipulated for such protection.

The term property, as applied to lands, embraces all titles, legal or equitable, perfect or imperfect.

Whether the title which passed by the Mexican grant, in this case, be regarded as perfect or imperfect, it constituted property ; and as such, the obligation to protect it was cast upon the United States, upon the cession of the country, both by the law of nations and the stipulations of the treaty.

The obligation was political in its character, binding upon the conscience of the new Government, and could only be executed in such manner and at such times as the Government in its judgment might deem expedient. By the Act of March 3d, 1851, the Government determined the manner and conditions under which it would discharge this obligation, and at the same time provided the means to ascertain and separate private claims from the public lands. For both of these objects the Act was passed ; and all titles, legal or equitable, were subjected *to* examination. Legal titles—such as were perfect under the former Government—did not need any action of the new Government for their protection ; but their presentation was necessary to enable the new Government to ascertain the extent of the property it had acquired by the cession of the country. Equitable titles required further action of the granting power for their protection, and their presentation was necessary to enable the new Government to discharge its political obligations in this respect.

The action of the Government upon the title presented took effect upon that title as it existed at the time the jurisdiction of the former Government over the subject ceased. The new Government succeeded to the obligations of the former Government with respect to the property claimed. Those obligations devolved upon the United States as a sovereign nation. Their power to enforce those obligations was therefore sovereign and supreme, and subsequent claimants took in subordination to their action.

Subsequent claimants have no ground of complaint, for whatever interests they

Leese v. Clark.

possess were acquired with knowledge of the treaty, and the obligations and powers of the new Government.

The State and individuals hold whatever property they possess, which formerly belonged to the Mexican Government, through the United States, and subject, therefore, to the action of the United States, whilst they held it, and subject to any action with respect to such property which they covenanted or were bound to take upon its acquisition. The legal effect of the action of the Government is the same as if such action had been taken the very day upon which the Mexican authorities were displaced.

The patent is the evidence which the Government furnishes the claimant of its action respecting his title. Before it is given, numerous proceedings are required to be taken before the tribunals and officers of the Government; and it is the last act in the series, and follows as the result of those previously taken. It is record evidence of the Government's action. By it the Government, representing the sovereign and supreme power of the nation, discharges its political obligations under the treaty and law of nations. By it the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the law of nations, and the stipulations of the treaty; and that the grant was located, or might have been located, by the former Government, and is correctly located by the new Government, so as to embrace the premises as they are surveyed and described.

This record, so long as it remains unvacated, is conclusive against the Government and against parties claiming under the Government by title acquired subsequent to the time at which the obligations of the Government attached.

The term "third persons," used in the fifteenth section of the Act of Congress, does not include intruders; nor preëmptioners claiming under the laws of Congress; nor locators of school warrants; nor any other persons whose interests have been acquired since the acquisition of the country, when the obligation to protect existing rights of property devolved upon the United States. They refer not to all persons other than the United States and the claimants, but to those who hold independent titles arising previous to the acquisition of the country. The latter class are not bound by the decree and patent, for they do not hold in subordination to the action of the Government, nor by any title subsequent, but by title arising anterior to the conquest.

Opinions expressed by individual legislators upon the object and effect of particular provisions of an Act under discussion, are entitled to little weight in the construction of the Act. The intention of the Legislature must be sought in the language of the Act, and the object expressed or apparent on its face.

When a jury renders a general verdict, and also special findings, the latter will control the former, if there is any inconsistency between them; and the Court will direct judgment to be entered in accordance with the special findings.

APPEAL from the Twelfth Judicial District.

This was an action of ejectment to recover the possession of two

one hundred-vara lots, situated within the city and county of San Francisco.

The plaintiff relied for a recovery of the premises upon a grant made to himself and Salvador Vallejo, on the twenty-first of May, 1839, by Juan B. Alvarado, then Mexican Governor of the Department of California; and upon a patent of the United States, issued to them on the third day of March, 1858, upon the confirmation of the grant, pursuant to the Act of Congress of March 3d, 1851; and the approved survey of the premises by the Surveyor General of California, following such confirmation. The case was before this Court at the July term, 1861, and is reported in 18 Cal. 535. The petition to the Mexican Governor, and the grant by the Governor, will be found in that report. The following is a copy of the patent of the United States:

## " The United States of America.

" To all to whom these presents shall come, *Greeting:* Whereas it appears from a duly authenticated transcript on file in the General Land Office of the United States, that pursuant to the provisions of the Act of Congress, approved the third day of March, one thousand eight hundred and fifty-one, entitled 'An Act to ascertain and settle the Private Land Claims in the State of California,' Jacob P. Leese and Salvador Vallejo, as claimants, filed their petition on the twenty-seventh day of February, 1852, with the Commissioners to ascertain and settle the private land claims in the State of California, sitting as a Board in the city of San Francisco, in which petition they claimed the confirmation of their title to certain lots or portions of land situated within the limits of the city of San Francisco, in said State, being in form a parallelogram, one hundred varas wide and two hundred varas long; said claim being founded on a Mexican grant made to the petitioners on the twenty-first day of May, 1839, by Juan B. Alvarado, Governor of Alta California, acting under the authority of the Mexican Government. And, whereas, the Board of Land Commissioners, aforesaid, on the fifth day of February, 1856, rendered a decree of confirmation in favor of said petitioners as follows: ' In this case, on hearing

Leese v. Clark.

the proofs and allegations, it is adjudged by the Commissioners that the claim of the said petitioners is valid, and it is therefore decreed that the same be confirmed.'

" The land of which confirmation is made is situated in the present city of San Francisco, and consists of two lots of one hundred varas square, each being the same, which was granted to the said claimants by Governor Juan B. Alvarado, on the twenty-first day of May, 1839, and is bounded as follows : Beginning at the point known, at the date of said grant, as the Punta del Embarcadero ; thence northwardly, along what was then the shore of the bay of San Francisco, two hundred varas to the *playita* (little beach) ; thence westwardly, and at a right angle with the first mentioned line, one hundred varas ; thence by a line parallel with said first mentioned line, two hundred varas, to a point one hundred varas distant from the place of beginning ; thence a straight line to the said place of beginning.    For a more particular description, reference to be had to the original petition and grant filed among the papers in the case.

" And whereas, an appeal from said decision having been taken on behalf of the United States, to the District Court of the United States for the Northern District of California, as further appears from a certified transcript on file in the General Land Office, and the Attorney General of the United States having given notice that the appeal in this case would not be prosecuted, the said District Court, on the sixth day of April, 1857, at a stated term, ' Ordered, adjudged and decreed, that the appeal from the decision of the U. S. Land Commissioners be dismissed, and that claimants have leave to proceed under the decree of the said Land Commission, heretofore rendered in their favor, as under final decree.'

" And whereas, under the thirteenth section of the said Act of March 3d, 1851, there has been presented to the Commissioner of the General Land Office, a plat and certificate of the survey of the land confirmed as aforesaid, authenticated on the twenty-ninth day of May, 1857, by the signature of the Surveyor of the public lands in California, which plat and certificate are in the words and figures following, to wit:

" UNITED STATES SURVEYOR GENERAL'S OFFICE,
     " SAN FRANCISCO, Cal., May 29th, 1857.

" Under and by virtue of the provisions of the thirteenth section of the Act of Congress of the third of March, 1851, entitled ' An Act to ascertain and settle the Private Land Claims in the State of California,' and of the twelfth section of the Act of Congress, approved on the thirty-first day of August, 1852, entitled ' An Act making Appropriations for the Civil and Diplomatic Expenses of the Government, for the year ending the thirtieth day of June, eighteen hundred and fifty-three, and for other purposes,' and in consequence of a certificate from the United States District Court for the Northern District of California, of which a copy is hereunto annexed, having been filed in this office, whereby it appears that the Attorney General of the United States, having given notice that no appeal will be further prosecuted in the case of the *United States*, appellants, v. *J. P. Leese, et al.*, appellees, numbered four hundred and twenty-one on the Court docket, the said District Court, at a stated term thereof held on the sixth day of April, 1857, on the motion of the District Attorney of the United States : ' Ordered, adjudged and decreed, that the appeal from the United States Land Commissioners be dismissed, and that the claimants have leave to proceed under the decree of the said Land Commission, heretofore rendered in their favor, as under final decree ;' and whereas, by the decree of the said Land Commissioners thus referred to, and of which a copy is also hereunto annexed, the claim of said Jacob P. Leese and Salvador Vallejo, number seventy-four on the docket of the Board of Land Commissioners, to two lots of one hundred varas square each, in the city of San Francisco, was recognized and confirmed, I have caused the same to be surveyed in conformity to the grant thereof and the said decision, and do hereby certify the annexed map to be a true and accurate plat of the said tract of land, as appears by the field notes of the survey thereof made by A. H. Jones, Deputy Surveyor, in the month of May, 1857, under the direction of this office.  And I do further certify, that under and by virtue of the said confirmation and survey, the said Jacob P. Leese and Salvador Vallejo are entitled to

a patent from the United States, upon the presentation hereof to the General Land Office, for the said tract of land, the same being bounded and described as follows, to wit:

[Here follows a description of the lots by metés and bounds, and appended to the description is a map on which the survey is plotted.]

" In witness whereof, I have hereunto signed my name and affixed my official seal, at the city of San Francisco, California, this twenty-ninth day of May, 1857.

[SEAL.]                    " JOHN C. HAYS,
                    " U. S. Sur. General of California."

" Now know ye, that the United States of America, in consideration of the premises, and pursuant to the provisions of the Act of Congress aforesaid, of March 3d, 1851, have given and granted, and by these presents do give and grant, unto the said Jacob P. Leese and Salvador Vallejo, and to their heirs, the lots of land embraced and described in the foregoing survey; but with the stipulation, that in virtue of the fifteenth section of the said Act, the confirmation of this said claim and this patent shall not affect the rights of third persons; To have and to hold the said lots, with the appurtenances, unto the said Jacob P. Leese and Salvador Vallejo, and to their heirs and assigns forever, with the stipulation aforesaid.

" In testimony whereof, I, James Buchanan, President of the United States, have caused these letters to be made patent, and the seal of the General Land Office to be hereunto affixed.

" Given under my hand at the city of Washington, this third day of March, in the year of our Lord, one thousand, eight hundred and fifty-eight, and of the independence of the United States the eighty-second.

" By the President:    JAMES BUCHANAN.
[SEAL]                    " By WM. FLINN,
                    " Assistant Secretary."

The defendants produced and gave in evidence sundry grants of the same premises, in lots of fifty varas each, issued to them or

their grantors in 1847, by persons acting as Alcaldes or chief magistrates of the pueblo of San Francisco; and also proved that the premises were within the limits of the pueblo. It is unnecessary to state with further particularity the evidence offered by the defendants, as no motion was made to modify or set aside the special findings of the jury.

The Court charged the jury as follows: " The Supreme Court of this State has decided in this case, that a Mexican Governor had power to make grants of lands within the limits of a pueblo, and that such grants were within the provisions of the Act of Congress for the settlement of private land claims, passed March 3d, 1851; that the Board of Land Commissioners created under that act had jurisdiction to pass upon such claims; and that upon the confirmation of such claims a patent might issue; and that the same effect and operation should be given to such patent as to any other patent regular upon its face, issued by the United States upon the confirmation of a claim under a Mexican grant, pursuant to this Act of Congress. This patent was the last act of a series of proceedings taken for the recognition and confirmation of the claim of the patentees to the land it embraces, the first of which was the petition to the Board of Land Commissioners. It passes whatever interest the United States may then have possessed in the premises. It operates in consequence as an absolute bar to all claims under the United States having their origin subsequent to the petition. Nor can it be shown, in an action of this nature, that the lands included within the patent are not those described in the original grant. The Government, through its proper tribunals and agents, could only locate the lands; and when so located, such location is conclusive.

" But the patent, when issued, has no greater effect or operation than any other simple deed. It passes, when made, no other or greater interest, or right, than the Government possessed. If the Government was not possessed or seized of any right, interest or property in the thing patented, then nothing passed.

" By the laws and regulations of the Mexican Government, the chief object of the grants of the national lands was to colonize and settle the vacant lands. These grants were made for that purpose

without any claim of the grantees upon the bounty or justice of the Government.   There were certain conditions required by these laws to be performed by the grantee, the failure to perform which perhaps did not always work a forfeiture of the grantee's right as between him and the Government.   They were subject to be granted to and occupied by some other person, who desired and was ready to occupy them, and thus carry out the policy of extending the settlement of the public lands, which was the great policy of the nation.

" These conditions were required and intended to stimulate the grantee to prompt action in settling and colonizing the land, and to make open to appropriation by others, in case of failure or an unreasonable delay, to perform these conditions.   It is also as true, that if any other person within the limits where lands have been so granted, and the lands so granted should not have been located, nor the conditions thereto annexed performed so as to effectuate the objects of this law of colonization, should afterwards obtain a grant from the Government, or from any power competent to grant, so as to perfect his title, and acquired the legal title, and full property and possession, then the title of this subsequent grantee who had so perfected and procured such legal title and full property, would have the better, prior and paramount title to such land ; and such title cannot be impaired or affected by any subsequent survey or location of the first grantee.

" The first grant, until perfected by a survey and location, and a settlement pursuant thereto, is but inchoate and imperfect, and no more than an equity upon the conscience of the Government, to give the legal title as between him and the Government; but not to affect the vested rights of other persons.   As between these two individual claimants, the title of the one who had first obtained the perfect title for the specific land, though his grant be subsequent in date, would be the superior—better and elder title—and will prevail as against the other grant in an action of ejectment.

" By the general grant, not specific in quantity nor located, the Government did not bind itself to make no other grant within the territory described in the grant, until after the grantee had made his survey.   Negligence in respect to this, and to other conditions

required of the grantee and annexed to his grant, subjected the land to be denounced by another ; and the subsequent grant to another, followed by a survey, location and settlement, constitute such denouncement. ·

" The Supreme Court of this State have decided that San Francisco was, from and after the twelfth day of November, 1834, a pueblo, and that Alcaldes of such pueblo had power to grant lots within such pueblo.

" On the twenty-first day of May, 1839, Alvarado, then Governor of California, made the grant upon which the patent in this case is founded. That patent includes the premises in question. That grant was an inchoate and imperfect title. It created no more than an equity in favor of the grantees. It required the performance of the conditions annexed to the grant. It required other and further proceedings to pass the legal title, and to invest them with a complete title. These grantees were as much required to perform the conditions already mentioned, to perfect their title and to acquire the legal title and full property, as that of any other grant made by a Governor. The grant was made under the same law, and governed by the same regulations, as that of any other grant. It was subject to the same denouncement.

" From this, therefore, it follows that the grant so made was an inchoate and imperfect title, and required further action and performance of the conditions of survey and location to pass the legal title and full property to the subject of the grant. This was never done under the former Government. Without that it was a mere equity, subject to be denounced by another, by acquiring the legal title and full property under a subsequent grant. This grant so remained inchoate until February, 1847, when the then Alcalde of the pueblo of San Francisco, by grants made by him, granted these premises in question to certain other persons, under whom the defendants in this action now claim to hold. Those grants were made for specific lands located, and the boundaries fixed, and the grantees entered into possession of them and continued in such possession. These grants so made by the Alcalde were perfect grants, and passed the perfect and legal title to the grantees therein ; and the perfect title so acquired under such subsequent grants is a title

paramount to the patent afterwards acquired upon the grant made by Alvarado, and must prevail in this action.

" Therefore, gentlemen of the jury, if you shall find that the premises in question were, at the time they were granted, within the limits of the pueblo, then the plaintiffs cannot recover in this action; but you should then find for the defendants."

To this charge the plaintiffs' counsel at the time excepted.

The jury, under this charge, found a general verdict for defendants. Certain special propositions were at the same time submitted to the jury by the Court, which with the answers returned, are as follows:

" 1st. Did the Government of the United States, by its proper officers, on the third day of March, 1858, issue a patent to Jacob P. Leese and Salvador Vallejo ; and are the lands embraced in said patent the same lands in controversy in this action ?  If there was such patent, please say whether it is the same given in proof in this cause ?

" Answer.  Yes.

" 2d.  Did said Vallejo, on the third day of August, 1850, make and deliver any deed or instrument of conveyance to the said Leese, of his right, title and interest to the lands described in the grant of the Governor of California, recited in said patent, and if so, is it the same deed in evidence ?

" Answer.  Yes.

" 3d.  Were the defendants, or any of them, at the time of bringing this suit, in possession of the lands in said patent mentioned, or any part thereof; and if so, which of the defendants ?  And were said defendants, or any of them, in such possession of the particular parcels severally described in the several stipulations, respectively dated August 4th, 1859, December 12th, 1859 and February 14th, 1862, which said stipulations were offered and received in evidence in the cause ?

" Answer.  Yes.

" 4th.  Were the premises in controversy within the limits of the pueblo of San Francisco in 1846, and before that time ?

" Answer.  Yes.

" 5th.  Were said premises within two hundred varas of the orig-

inal water line of the shore of the bay of San Francisco, as the line was in 1847 ?

"Answer. Yes.

"6th. Were said premises improved, used or occupied, or actually possessed in 1834, or at any subsequent time, down to the date of the Alcalde grants under which the defendants claim?

"Answer. No.

"7th. Was the land in the complaint described and sought to be recovered, vacant and unoccupied prior to May 12th, 1839, and did it continue so vacant and unoccupied until after it was granted by the Alcalde grants in defendants' answers specified, and until the date of the taking possession thereof by the defendants, and those through whom they claim under said Alcalde grants?

"Answer. Yes.

"8th. Were the defendants, and those through whom they respectively claim, in the actual possession of the premises in complaint described and sought in this suit to be recovered, on the first day of January, 1855, and continuously thenceforward, in such actual possession, until on and after the twentieth day of June, 1855, and until on and after the eleventh day of March, 1858?

"Answer. Yes.

"9th. Did defendants named in the stipulations, dated August 4th, 1859, and December 12th, 1859, produce and give in evidence the original Alcalde grant of fifty vara lot number three hundred and twenty-six, and book 'A' of original grants in said stipulations named; and did said grant and said book 'A' show the several Alcalde grants made by the Alcaldes to the persons, of the dates and of the fifty vara lots in said stipulations specified?

"Answer. Yes."

Upon the special findings, the plaintiff moved for judgment in his favor, notwithstanding the general verdict; but the Court overruled the motion, and plaintiff excepted. Judgment was thereupon entered for defendants, from which plaintiff appeals. All other material facts are stated in the opinion.

*Baldwin & Haggin*, for Appellants.

I.   The Court below should have ordered judgment for plaintiff upon the special findings, the general verdict notwithstanding.

Leese *v.* Clark.

No exceptions were taken to any of the special findings—indeed, the facts were not disputed on the trial; but the whole case became a question of law, involving this single inquiry: Whether the patent of the United States for land confirmed by the U. S. Land Commission—the confirmation being of a Mexican Governor's grant, dated and issued in 1839—is better evidence of title to the land than an American Alcalde's grant, issued in 1847?

It will be seen that the Judge below assumes that the Governor's grant was in colonization. It is hard to see how the learned Judge got the notion that the object was to settle on or colonize a wharf. The Governor's grant is referred to in the stipulations in proof, and the Court can see its conditions, which were not of occupation, improvement, or anything of the kind; nor was any obligation imposed to build within a given time.

It is not necessary to go largely into this argument, as we think that the learned Judge, not contumaciously but undesignedly, has overruled the decision of the Supreme Court in 18 Cal., which decision is the law of this case. (*Davidson* v. *Dallas*, 16 Cal. 75.) As the Court understands its own decision, it hardly needs any detailed exposition of its meaning.

The principle of this case differs from that of the *Fremont case*, in 17 How., for this was a grant of definite quantity and limits, and only uncertain as to where those limits were. It was not a grant of a quantity to be taken from a larger area, but a grant of a particular spot, to be ascertained by the action of the Government— the grant operating a present title to that spot, but the spot to be fixed; the Government having full power to fix it; but when fixed, the act fixing it to have relation to the date of the grant. This is expressly affirmed by the decision in 18 Cal. 575.

II.   There is nothing in the point that the land was subject to denouncement, and that the Alcalde grants had the effect of or were equivalent to this denouncement.

1st. The right of denouncement, as to a grant issued by itself, was in the Government, not in the city.

2d. The mere fact of a regrant is not a denouncement, or equivalent to a denouncement.

At common law, a cause of forfeiture for condition broken is not

a forfeiture ; but the grantor must make actual entry, in order to avail himself of the cause of forfeiture, and to revest the title.

The civil law required denouncement, which was a judicial, or *quasi* judicial inquiry, officially instituted by the Government, to determine the fact of noncompliance.

In both systems, the mere subsequent deed of the grantor was insufficient. (See case of *Holliday* v. *West*, 6 Cal. 521, overruling *Touchard* v. *Touchard*, 5 Cal.; and *Hart* v. *Burnett*, 15 Cal.)

3d. The Board of Land Commissioners passed on this whole question of the plaintiff's title, and the decision is conclusive of everything affecting the title—this alleged cause of invalidity as every other. It was for the Government to enforce the forfeiture, or to waive it; it chose to waive it, and its judgment, affirming the title, is plenary proof of that waiver.

The idea that an American Alcalde, not representing the American Government or the Mexican Government, could assert a higher claim than the Government, is monstrous. If this were the case, every grant of the Government, certainly all those within pueblos, might have been invalidated by the summary process of the local authorities regranting the lands.

The whole stress, and strain, and effect of the decision in *Leese* v. *Clark* (18 Cal.) is, that the Government had the power, by virtue of its political obligations, to pass upon this whole question of title ; that this, of course, involves an inquiry into all the elements which make up the title, or deny its validity ; that the appointed agency for this office was the Board of Commissioners ; that this Board had full jurisdiction over persons and subjects connected with the claim ; and that its judgment, followed by the patent—which is the execution of the judgment—is conclusive of both the title and boundaries, and establishes definitively that title and those boundaries as of the date of the grant, qualified only by this, that the patent is not effectual against third persons ; but this qualification does not apply here, for the reason that the Court holds that these Alcalde grantees are *not* third persons, which leaves the proceedings of the Board, *quoad* this case, absolutely conclusive.

Yet the learned Judge below, not contumaciously but by manifest error, holds that the plaintiff had no title, and has none now,

as against third persons; which went further than the Judge on the first trial, who held we had a title, if we could find a place which it covered.

This Court ruled that the patent was definitive—not only of title, but as to the place; and now the District Court, on the return of the cause, holds that it is void, both as to title and place; and that, not as against third persons, but as against these Alcalde grantees, who are not third persons.

In *Hart* v. *Burnett* it is held that the true construction of *Touchard* v. *Touchard*, (5 Cal.) was to hold, that the process of denouncement applied only to a Government grant, and not to a grant by the municipal authorities.    And *Holliday* v. *West* over-rules so much of *Touchard* v. *Touchard* as held that the second grant took the property, when condition subsequent had been broken.

But the conclusive answer to the whole point is, that there could be no denouncement, except, at most, for breach of the conditions of the grant to Leese and Vallejo.    These conditions are set out, and occupation, settlement or improvement are not among them.

So the Judge below holds that the Alcalde may regrant after a Governor's grant; that in this way he may revoke the Governor's title, even within two hundred varas of the beach (where the Alcalde had no right to grant); that this regrant is a denouncement for a cause which was not mentioned, but other conditions being mentioned, was in effect excluded by the grant; and that a grant, on consideration of a strip of land to build a wharf, was a grant in colonization; and a grant of two hundred varas, in a particular spot, was an indeterminate grant, as to limits, like Fremont's.

*Thompson Campbell* and *O. C. Pratt*, for Respondent.

I.    The rule that when a case is brought to the appellate Court a second time, the opinion previously pronounced, even though the Court may be satisfied that it is erroneous, is to be regarded as the settled law of the case, is not correct, and is inapplicable to the case before the Court.

1.  The case of the *Washington Bridge Co.* v. *Stewart et al.*, (3 How. U. S. R. 413) is referred to as furnishing authority for the

rule. The principle on which the rule, as laid down in that case, is made to depend, grows out of the peculiar organization of the Supreme Court of the United States, and to which the State supreme tribunals bear no strict analogy.

The reason of the rule, as explained in 3 Howard, is that there is no mode pointed out by law in which an erroneous judgment rendered by that Court can be reviewed in that or any other Court; that there is no law which authorizes that Court to review its decisions; and that in all cases over which it has jurisdiction, its judgments are final, and from which there is no appeal. Starting from this point, the theory of that Court is, that it never commits an error, and that it never overrules one of its own decisions.

The Supreme Court of a State neither theoretically nor practically acts upon any such principle. Mr. Greenleaf has furnished the profession with an entire volume of overruled cases, made up principally of the decisions of State tribunals. Besides, the Supreme Court of a State is not in all cases, over which it has jurisdiction, the Court of last resort, and from which there is no appeal. The case under consideration happens to belong to the class of excepted cases.

Upon an examination of the California cases on the subject, (*Dewey* v. *Gray*, 2 Cal. 377 ; *Clary* v. *Hoagland*, 6 Id. 687 ; *Davidson* v. *Dallas*, 15 Id. 75) we find that the Court, in assigning causes for inflexibly adhering, right or wrong, to what is termed "the law of the case," have confounded the reasons from which three legal and distinct maxims or rules of the law had their origin. These are:

1. The law of the case.

2. The doctrine of *res judicata*.

3. The maxim of *stare decisis*.

When we speak of "the law of the case," we are to be understood as treating those terms in the sense in which they are used in the precise point under consideration.

*Res judicata* is defined to be the decision of a legal or equitable issue by a Court of competent jurisdiction. Again, it is said that in order to make a matter *res judicata*, there must be a concurrence of the four conditions following, viz: 1. Identity in the thing sued

for.   2. Identity of the cause of action.   3. Identity of persons and of parties to the action.   4. Identity in the quality of the persons for or against whom the claim is made.

The doctrine of *stare decisis* is supported on principles and for reasons entirely different from those which apply either to "the law of the case" or to the doctrine of *res judicata*.

It is a general principle, that where a point has been settled by a series of decisions, it forms a precedent, which is not afterwards to be departed from.   It is also necessary, for the sake of property, that a settled rule should be observed.   It is in view of this principle, that an erroneous decision is permitted to stand, because its correction might occasion greater confusion to titles and rights which had grown up under it, and produce a wider spread injustice than would result from the perpetuity of the error.

But such reasoning can have no applicability to a case where no final decision has been made between the parties ; where no rule of property has been established ; where no rights have grown up under it ; and where the question is, not only whether a Court shall knowingly commit a glaring wrong upon one of the parties by an erroneous application of the law to his case, but whether a precedent shall be thus established under which interests of the greatest magnitude may grow up, and that, too, before the Court can have an opportunity of correcting their error in a subsequent case, and between other parties.

In *Wright* v. *Douglass*, (10 Barb. S. C. R.) the Court says : "And though we entertain the utmost respect for the opinion of the Court of Appeals, yet when the new evidence in the cause removes the ground which was made the principal foundation of that opinion, we regard ourselves as at liberty to declare the same judgment which we rendered on the former occasion."   In Rutherford's use of *Collen* v. *Lafferty*, (2 English, 404) the Court, having by mistake of a fact decided against the law of the case, on the second appeal corrected it, and that, too, when the inferior Court had followed the decision of the appellate Court.   Authorities on this point might be multiplied, but they are unnecessary.   In an action of ejectment, however, as will hereafter be shown, no such rule has ever been sought to be applied.   All reasons for it in such actions are utterly wanting.

2. Conceding the principle that Courts will not, as a general thing, on a second appeal, review their own decisions, the rule does not extend to cases involving questions of a public nature, where great public interests are involved; such, for instance, as are affected by the construction of an Act of Congress, like the one under consideration.

The line which separates the two classes of cases referred to, we think, is distinctly visible to every legal eye. The decision which merely declares the law of a contract between two parties, although it may be erroneous and carry with it a certain degree of injustice, still, is confined to that case and to those parties, and before it assumes the shape of a precedent, the error can be corrected. But where the rights of parties depend upon the construction of a public law, by which the rights of property are to be ascertained and settled, the question is not confined to the parties before the Court, but the public become deeply interested, and interests of great magnitude soon grow up under the rule as laid down by the Court. If the first construction of such a law is erroneous, great landmarks of property are disturbed, titles are unsettled, and the injury and injustice occasioned become general and widespread. Is it not, then, of the first importance, that decisions involving questions of this public nature should, if erroneous, be corrected, while it is yet within the power of the Court to prevent the evil consequences which must inevitably flow from such decision? (*Hammond* v. *Inloes,* 4 Md. 138 ; *Martin* v. *Hunter's Lessees,* 1 Wheat. 354.)

3. If the doctrine of *res judicata* should in all its strictness be applied to cases coming before the appellate Court on the second appeal, then we insist that the action of ejectment forms an exception to that general rule.

It is a universally recognized principle, that a judgment or decree of a Court, possessing competent jurisdiction, shall be final as to the subject matter thereby determined. But it is not only final as to the matter actually determined, but as to every other matter which the parties might litigate in the cause, and which they might have had decided. All such judgments form a complete bar to a subsequent action between the same parties, on the principle that it is *res judicata.*

Kent, Justice, after having in the case of *La Guen* v. *Gouverneur & Kemble*, (1 John's Cases, 502) laid down the rule as above stated, in speaking of exceptions to the general rule, says: " The case of an ejectment on which the defendant, in neglecting to bring forward his title, is not precluded by the recovery against him from availing himself of it in a new suit." 1 Yates' Rep. 521.

In this State, as we understand the law, the common law rule, that a judgment in ejectment is no bar to another action between the same parties for the same premises, has not been changed by our system of pleading. Here the action of ejectment has always been held to be merely a possessory action. (*Payne & Dewey* v. *Treadwell*, 5 Cal. 311; *Garner* v. *Marshall*, 9 Id. 270.) In the latter case, Field, J. says: " Ejectment is a possessory action, and must be brought against the occupants; it determines no rights but those of possession at the time, and it matters not who claims to have the title to the premises." And again, in *Yount* v. *Howell* (14 Cal. 468) the same Judge, in speaking of the conclusiveness of the judgment in an action of ejectment, says: " With us, the judgment is only conclusive of two points: the right of possession in the plaintiff, and the occupation of the defendant at the institution of the suit."

The admitted principle, that the action authorized by the Code, for the recovery of real property, is merely possessory, excludes the idea altogether that a judgment can be set up as a bar to a subsequent action.

II.   The patent of the United States is a mere quitclaim of the Government.

The precise effect which it was the intention of Congress to give to such patents, can best be ascertained from an examination of the debates in the Senate of the United States when that provision was considered.

The following extracts will be found in the twenty-third volume of the Congressional Globe, on the pages referred to.   On page 157, Senator Gwin wished the Act of 1824 extended to California, with the exception of that provision which required the claimants to make adverse claimants parties.

On page 347, Senator Berrien moved to amend so as to make

the final decrees conclusive only as against the United States, instead of the decrees of the Commissioners.

On page 348, Senator Berrien explained the effect of the decrees of the Courts to operate only between the United States and the claimants, and as he expressed it, " to decide no contest of individual title."

On page 359, Senator Berrien said, in explanation of the effect of the patent, " thus, if the legal title has vested in the United States, and the patent should emanate, the legal title would be transferred to the patentee ; but if a better equitable title existed in another, that patentee would hold the legal title as a trustee for such other person."

On page 363, Senator Ewing was for discriminating in patents for perfect titles. He thought a mere quit claim enough in that class ; but in cases of imperfect titles, a patent in the form of a confirmation should be given.

On page 365, Senator Walker offered an amendment : " That in every case where a patent shall be issued, the patent shall operate only as a relinquishment of the title of the United States to the land patented."

On page 371, he explained that the object was to make a distinction between an ordinary patent and a mere quit claim, or relinquishment of the lands on the part of the Government.

Same page, Senator Ewing said : " I see no objection to the amendment ; it seems to be carrying out the effect of the bill."

Same page, Senator Badger thought " it was unnecessary, for the reason that when the United States received no consideration for the conveyance, it can have no operation but to guaranty the validity of the patent. From the nature of the case, it must be a mere release or quit claim." He thought the form of the patent, showing for what it issued, would show that it was a mere release.

On page 361, Senator Ewing, in commenting on the force of a patent, says : " That the individual presenting the claim shall have his patent. But perhaps he is not the person who is actually enti-

Leese *v.* Clark.

tled to the land; perhaps a patent, when issued to him, will put a weapon in his hands which he ought not to have."

On same page, Senator Davis " thought no patent was necessary; that private rights should be left to the State judicial tribunals to settle."

On page 372, Senator Downs "thought the Walker amendment unnecessary, because," he says, " the bill already contains everything which is intended by it. It only made an additional declaration of the same thing."

On page 373, Senator Baldwin offered his substitute to the Walker amendment, changing it to this extent: " that the relinquishment should inure to the benefit of the patentee, or such other person or persons, if any, as between him and them may have a better title thereto."

On same page, Senator Berrien opposes the amendment, on the ground that it is not necessary, and speaking of the effect, he says: " No legal principle is better established than this; it relinquishes the title of the sovereign making the grant, and leaves individual titles precisely as they stood."

On the same page, vote taken on said amendment and rejected; twenty-one for, twenty-four against, on the express ground that it was not necessary.

On page 428, Senator Walker proposed this amendment: After the word State, to insert " or any patent to be issued."

Without this, Mr. Walker doubted whether the Courts would adopt the idea that the patent was to be nothing more than a relinquishment of title.

As the provision stood, it was limited to the decrees of the Commissioners, District and Supreme Courts.

This amendment elicited general approbation, as expressing more clearly the sentiments of the Senate, and extending the provision to a patent.

On page 429, Senator Underwood said: " If you grant a patent, it can have no effect upon the rights of any one, unless it be upon a party to a litigation, which is provided for by this bill."

On same page, Senator Davis, expressing himself strongly in favor of the amendment, says: " If I understand the matter, we

Leese v. Clark.

are all agreed that the United States do not mean to do more than
to release what right they may have to the patentee."

Senator Berrien opposed the amendment.

The amendment was then adopted—ayes, twenty; noes, twelve.

The foregoing extracts present in the clearest possible manner,
not only the effect, but the absolute limitation which Congress in-
tended those patents should possess.

From this it results, that, in the language of Senator Badger, a
patent so issued, " from the nature of the case, must be a mere re-
lease or quit claim."

But the distinction here referred to, between an ordinary patent,
issued by the Government for the public lands, and the patent au-
thorized to be issued by the Act of 1851, so far as the rights of
third parties are concerned, has its foundation in an established
principle of law, and which characterizes all the legislation of Con-
gress on that class of cases, from the date of the acquisition of
Louisiana, in 1803, up to the enactment of the law of 1851.

In the case of *Garland* v. *Wynn*, (20 How. 8) the Supreme
Court of the United States announced this principle in the following
clear and explicit language: " The general rule is, that where
several parties set up conflicting claims to property, with which a
special tribunal may deal, as between one party and the Govern-
ment, regardless of the rights of others, the latter may come into
the ordinary Courts of justice, and litigate the conflicting claims."
(*Lytle* v. *The State of Arkansas*, 9 How. 328 ; *Cunningham* v.
*Ashley*, 14 Id.; *Bernard* v. *Ashley*, 18 Id. 44 ; *Morehouse* v.
*Phelps*, 21 Id. 304–5; *United States* v. *White*, 23 Id. 253 ;
*Greer et al.* v. *Mezes et al.*, 24 Id. 275 ; *Killridge* v. *Breaud*, 5
Rob. 83 ; 12 Rob. 7 ; 5 Rob. 470 ; 4 L. O. S. 445–6.)

III. The Land Commission decided upon two classes of cases ;
the one called a perfect or legal title, and the other an imperfect or
equitable title.    The Government is required to issue a patent in
both classes ; in the one where it had no interest to convey, as well
as in the other, where it had the legal title to convey.    Will it be
contended that the patentee in the former case is placed in any
different relation towards adverse claimants than he occupied before
his patent was issued ?    But it is said that this patent is a record

of the Government, etc., and for that reason it shall have a further operation and effect.

This record of the proceedings upon which the patent is issued has been, for some reason to us unknown, affixed to and made a part of the patent.   Now, it is the duty of the Commissioner of the General Land Office, upon receiving a certificate of confirmation, with a plat duly approved by the Surveyor General, to issue to the claimant a patent.

This record, really, has nothing to do with the patent, and instead of giving to it any additional solemnity, it operates as a limitation ; because the only effect it could possibly have was well expressed by Senator Badger, when he said, " that the form of the patent, showing for what it issued, would show that it was a mere release." This record would, in the case of a perfect title, show that the patent really conveyed nothing to the patentee that he did not have before.   Besides, this record shows that all the proceedings upon which the patent issued were entirely *ex parte*, and were binding upon no one except the patentor and patentee.   It is not, therefore, perceived how this record can give any additional operation or effect to the patent.

IV.  In defining the precise nature of the title under which the defendants claim to be " third persons," within the meaning of the fifteenth section of the Act of March 3d, 1851, the following propositions are submitted :

1st.  The power of the Governor to transfer the title of the pueblo lands was merely concurrent with that of the pueblo officers.

2d.  The effect of the fourteenth section of the Act of 1851, is a declaration by the political department of the Federal Government, that the legal title to the pueblo lands in California was, at the date of the treaty, in the pueblo, and that it did not pass by the deed of cession to the United States.

3d.  That if the concession to Leese and Vallejo had not been made, and if the grant under which the defendants claim had not been made, the legal title to the premises in question would have remained in the city.

4th.  That the concession to Leese and Vallejo did not transfer to them the legal title.

27

5th. That the patent, now held by the plaintiffs, is the result of *ex parte* proceedings before the Board of Commissioners, carried on by two parties, in neither of whom the legal title to the premises in question had ever vested, for any time, or for any purpose. (*Hart* v. *Burnett*, 15 Cal. 560–2; *New Orleans* v. *The United States*, 10 Pet. 662, 731, 735–6.)

6th. That a patentee, by virtue of his patent, only takes the title of his patentor, whatever it is at the date of his patent.

These propositions are incontrovertible; and from them it is deduced, that if the action of the Governor, on the twenty-first day of May, 1839, did not forever withdraw the premises in question from the class of grantable lands lying within the limits of the pueblo of San Francisco, the Alcalde's grant, made in March, 1847, transferred to the defendants the legal title to said premises, stripped of all equities of every description whatever.

V. When the defendants received their grants, the granting power of the Governor had ceased, while the power of the pueblo officers continued in full force; therefore, when the Alcalde made his grant, there was neither a paramount nor a concurrent power in existence. The power of the Alcaldes, after the seventh day of July, 1846, was the sole and exclusive power authorized to make grants within the pueblo limits.

The defendants had the right to appear as " third persons." Their title is derived from the Mexican Government. It is neither in privity with the plaintiff, nor with the United States. Under the provisions of the eighth section of the Act of 1851, the defendants had a title over which the Commission had jurisdiction, and it required the special restriction contained in the fourteenth section to prevent the provisions of the eighth section from extending to that particular class of cases to which the defendants' claim belongs. We shall assume that all persons holding a title derived from the Spanish or Mexican Governments, and upon which the Commission acted, would, if their rights were affected by the issuance of a patent to other parties, be " third persons," according to the meaning of that term. Now, the grantor of the defendants, viz: the city of San Francisco, if our assumed attitude be correct— if she were the defendant in the present proceeding—her right to

defend as a third person, whose interests were affected by the plaintiff's patent, could not be questioned.

The defendants stand in her place ; are privies in estate with her ; they are neither intruders nor trespassers, but stand upon the title and the rights of their grantor.

If they are not " third persons," whose rights have been affected by a proceeding to which they were not a party, carried on regardless of their rights, and to whom the law in its most solemn form promised protection and relief, then the law itself is a delusion and a snare.

FIELD, C. J. delivered the opinion of the Court—COPE, J. concurring.

This case was before this Court at the July term, 1861. It is an action of ejectment for certain premises situated within the city of San Francisco, in which the plaintiff claims under a grant of the former Mexican Governor of California, made to himself and Vallejo, in May, 1839, and a patent of the United States issued upon its confirmation, in March, 1858 ; and the defendants claim under certain American Alcalde grants made in 1847. Upon the first trial of the case, it was contended by the defendants that the premises in controversy, being town lots of the pueblo of San Francisco, existing as such pueblo on the seventh of July, 1846, the claim of the plaintiff and Vallejo, under the grant of the Mexican Governor, was not subject to the jurisdiction of the United States Board of Land Commissioners ; and that, in consequence, its action, and the subsequent action of the United States District Court, of the Surveyor General, and of the authorities at Washington, in issuing the patent, were without authority and void ; and, further, that if the grant were subject to the jurisdiction of the Board, the defendants, claiming under the Alcalde grants, were third persons, within the meaning of the fifteenth section of the Act of Congress of March 3d, 1851, against whom the decree of confirmation and patent were not conclusive ; and that they were, in consequence, as much at liberty to question the location of the premises as if the grant had never been before the Commission. Proceeding upon this view of the jurisdiction of the Board, and the construction of

the fifteenth section, the defendants directed their proof to show that the premises in controversy were not covered by the grant in question. The evidence as to the locality of the starting point of the premises granted was conflicting, and the jury found for the defendants, on the ground, as stated in their verdict, that they could not locate the grant as claimed by the plaintiff. But on appeal from the judgment rendered upon the verdict, this Court held that the fact that the premises, described in the Mexican grant and the patent of the United States, were town lots of a pueblo, existing on the seventh of July, 1846, or at the date of the grant, in May, 1839, did not exclude the claim of the grantees from the jurisdiction of the Board, but, on the contrary, that jurisdiction was rightfully taken by the Board; and that to the patent subsequently issued, the same operation and effect were to be accorded as to any other patent, regular on its face, issued by the United States, upon a confirmation of a claim under a Mexican grant, pursuant to the Act of Congress of March 3d, 1851.

And this patent, we held, was to be regarded in two aspects: as a deed of the United States, passing whatever interest they possessed in the premises at the date of the presentation of the petition for a confirmation of the claim under the Mexican grant to the Board of Land Commissioners; and as a record of the Government, showing its action and judgment with respect to the title of the patentees at the date of the cession of the country. As the record of the Government, we said, it imported absolute verity upon all the matters of fact and law essential to authorize its issuance, and could only be vacated and set aside by direct proceedings instituted by the Government, or by parties acting in the name and by the authority of the Government. Until thus vacated, it was conclusive, not only as between the patentees and the Government, but between parties claiming in privity with either by title subsequent. It was conclusive, except as to the "third persons" mentioned in the fifteenth section of the Act of Congress. And the "third persons," within the meaning of that section, we held to be those "whose title to the premises patented, not only accrued before the duty of the Government and its rights under the treaty attached, but whose title to such premises was at that date such as to enable

them to resist successfully any subsequent action of the Government affecting it."

Proceeding upon this definition of third persons, we considered the claim of the defendants, holding under Alcalde grants issued in 1847, to be regarded in that character.    For this purpose, we assumed, as alleged by the defendants, that American Alcaldes in 1847 possessed authority, under the laws of Mexico, which were not abrogated during the military occupation of the country, to make grants of land within the limits of the pueblo of San Francisco—in other words, to transfer the title of the pueblo.    But the political head of the Department of California also possessed a like authority, and exercised it in numerous instances, and his authority was paramount—that is to say, its exercise could not be interfered with, or in any manner defeated, by any subsequent action of the pueblo or its officers.    Admitting, we said, the power of the Alcaldes—the *de facto* municipal officers—to its fullest extent ever asserted by the present Court, " it only extended to lands which had not been previously granted by the superior authorities of the Department under the former Government.    Nor does it matter in any respect whether the grant of those authorities passed a legal or an equitable title.    The moment they assumed the control of the property, and passed any interest in the same, all granting power of the subordinate officers of the pueblo with respect to the property ceased."    In thus holding, we only declared what must appear obvious to every one, that when an officer of paramount authority makes a grant, an inferior officer cannot defeat and destroy it, by issuing another grant himself for the same premises.

And as to the uncertainty in the precise location of the boundaries of the premises covered by the grant to the plaintiff and Vallejo, we observed, following in that respect previous decisions of this Court, and of the Supreme Court of the United States, that the right or power of fixing the boundaries — in other words, of locating the land, as preliminary to the judicial delivery of its possession, belonged to the former Government, and could not be exercised by the grantees, at least so as to bind the Government. They took with full knowledge of the right and power of the former Government in this respect, and in strict subordination to their ex-

Leese *v.* Clark.

ercise.  If that Government never acted in the matter, and surveyed off the tract, and thereby fixed its boundaries upon the surface of the earth, the right and power passed to the United States, and could be exercised by them in such manner and at such time as they might deem expedient.  " The defendants, as junior grantees," we said, " took their grants with this knowledge ; that if the military occupation of the country ceased, and the displaced Mexican authorities were restored, they would only take, if in that event they were allowed to take at all, in subordination to the action of those authorities in the location of the elder grant ; and that if the United States permanently retained possession of the country, they would take in subordination to like action of the new Government. By the Act of March 3d, 1851, the new Government designated the manner and conditions under which the right and power of location would be exercised, and declared the effect which should be given to the proceedings had.  The defendants, taking whatever interest they may possess in subordination to the future action of the Government, old or new, in determining the location of the elder grant, are in no position to question those proceedings."  In thus holding, we only applied the doctrine that a grantee cannot complain of the exercise of a right reserved by the grantor at the time the grant was made.  Nor can a junior grantee, taking his grant with knowledge of such reserved right.  If, instead of a reservation of the right of determining the location of the grant by specific metes and bounds, the former Government had reserved a right of way over the premises, or a right to construct a fortification thereon, or a public hospital, and such right had passed to the new Government, no one would pretend that the exercise of the right thus reserved could be the subject of complaint or contestation by the grantee, or by any other person claiming under a junior grant with knowledge of the reservation.  We see no difference in the principle between the reservation actually made and the reservations supposed.  The defendants, therefore, taking whatever they acquired —subject to the action of the Government, whatever that might be, in the location of the elder grant—were in no position to resist such action.  They were not, therefore, third persons, within the meaning of the fifteenth section of the Act of Congress.

We also referred to the doctrine stated in the Fremont case, to the effect that a subsequent grantee of a tract with specific boundaries within the general exterior limits of the grant in that case, would have acquired a superior and better title than the original grantee, and held that it had no application to the case at bar ; as the grant here, unlike that under which Fremont claimed, embraced no surplus quantity to be the subject of other grants.

Such was the purport of our decision when the case was here at the July term, 1861.   The case, with the opinion of the Court, is reported at length in 18 Cal. 535.   The questions involved in it were elaborately argued by counsel, and carefully considered by the Court, and we have seen nothing since to create a doubt of the correctness of the conclusions at which we then arrived ; but on the contrary, much to strengthen and confirm them.   The decision was conclusive upon the rights of the parties as against each other under their respective grants.   As against the Mexican grant, confirmed by the patent of the United States, the defendants had no standing in Court to dispute its location.   On the new trial ordered they were obliged, therefore, to make their defense within the decision—that is to say, without calling in question its principles—or fail.   They might have made such defense by tracing title from the patentees, or showing outstanding title in grantees from them, and perhaps in other ways.   They could not retry the case in disregard of the decision, nor was it permissible to the Court to refuse to follow it on the retrial.   The learned Judge of the Fourth District will readily perceive, that if the Court over which he presides is at liberty to follow or not the decisions of this Court, according to its own views of their correctness, when a new trial is ordered, any other subordinate Court is equally at liberty to do so ; that the County Courts, and Recorders' Courts, and Justices' Courts, may for like reason refuse to be governed by our decisions, both in criminal and in civil cases.   The existence of any such liberty would be inconsistent with the relation which the Constitution contemplates the different tribunals of the State shall bear to each other.   With its existence there could be no real appellate power—no uniformity of decisions—and of course, no system of jurisprudence.   The final determination of a case would depend, not upon the law as laid

down by the Supreme Court, but upon a concurrence with its views by the inferior Court. In case of a persistent disagreement, a final determination would be impossible.

On the retrial, the District Court did not follow our decision, but disregarded and overruled it in almost every particular. It disregarded the decision as to the operation of the patent as a record of the Government with respect to the title of the patentees at the date of the cession, and declared that the patent had no greater effect or operation than a simple deed of the United States. It disregarded the decision as to the inapplicability of the doctrine of the Fremont case upon the effect of a subsequent grant within the general exterior limits of the grant in that case, and held that the doctrine applied to the Mexican grant in the case at bar; and therefore that the subsequent grants of the Alcaldes, with specific boundaries within its limits, gave the superior and better title. It disregarded the decision that even if the grant of the Mexican Governor passed only an equitable title, the Alcaldes had no authority to make a subsequent grant of the property; and decided that as the grant passed only an equitable title, and was subject to conditions, it was liable to be denounced, and the land to be regranted by the Alcalde, and that the subsequent grant, followed by location and settlement, constituted such denouncement. It overruled the decision that the defendants, claiming under the Alcalde grants of 1847, were not third persons within the meaning of the fifteenth section of the Act of Congress, who could contest the patent as evidence of the location of the grant, and ruled that the defendants, by their Alcalde grants, had a perfect and legal title to the premises—one paramount to the title derived from the Mexican grant confirmed by the patent of the United States.

Of course, upon these rulings of the District Court the verdict and judgment passed for the defendants; but as the rulings conflict with our previous decision, the verdict and judgment cannot stand. The decision of this Court on the first appeal became the law of the case, and fixed the right of the parties in this action under their respective grants. "A previous ruling of the appellate Court," as we held in *Phelan* v. *San Francisco*, "upon a point distinctly made, may be only authority in other cases, to be followed and af-

firmed, or to be modified or overruled, according to its intrinsic merits; but in the case in which it is made, it is more than authority—it is a final adjudication, from the consequences of which the Court cannot depart, nor the parties relieve themselves." (20 Cal. 39.) Such has been the uniform doctrine of this Court for years, and after repeated examinations and affirmations, it cannot be considered as open to further discussion. (See *Dewey* v. *Gray*, 2 Cal. 377; *Clary* v. *Hoagland*, 6 Id. 687; *Gunter* v. *Laffan*, 7 Id. 592; and *Davidson* v. *Dallas*, 15 Id. 82.) Nor is the doctrine peculiar to this Court. It is the established doctrine of the Supreme Court of the United States, and of the Supreme Courts of several of the States. (*Ex parte Sibbald* v. *United States*, 12 Pet. 491; *Washington Bridge Company* v. *Stewart*, 3 How. 413; and *Russell* v. *La Rogue and Hatch*, 13 Ala. 151.) And the reason of the doctrine is obvious. The Supreme Court has no appellate jurisdiction over its own judgments; it cannot review or modify them after the case has once passed, by the issuance of the remittitur, from its control. It construes, for example, a written contract, and determines the rights and obligations of the parties thereunder, and upon such construction it affirms the judgment of the Court below. The decision is no longer open for consideration; whether right or wrong, it has become the law of the case. This will not be controverted. So, on the other hand, if upon the construction of the contract supposed, this Court reverses the judgment of the Court below, and orders a new trial, the decision is equally conclusive as to the principles which shall govern on the retrial; it is just as final to that extent as a decision directing a particular judgment to be entered is as to the character of such judgment. The Court cannot recall the case and reverse its decision after the remittitur is issued. It has determined the principles of law which shall govern, and having thus determined, its jurisdiction in that respect is gone. And if the new trial is had in accordance with its decision, no error can be alleged in the action of the Court below. (*Young* v. *Frost*, 1 Md. 394; *McClellan* v. *Crook*, 7 Gill. 338.)

But the learned counsel of the respondents, whilst denying generally the correctness of this doctrine of the Court, contend especially that the doctrine has no application to actions of ejectment,

and is not extended to cases embracing questions of a public nature where great interests are involved—such, for instance, as may be affected by the construction of an Act of Congress.

The inapplicability of the doctrine to actions of ejectment is asserted, on the ground that such actions are brought merely for the possession, and determine no rights but those of present possession. Admitting this to be so, and we do not controvert the position, and that the title is only involved so far as it may affect the right to the possession, we do not perceive how the conclusion of counsel follows. The question is not, what is the effect of the judgment in ejectment when recovered, but what effect is to be given to the decision of the appellate Court on the second trial of the same case, or upon a second appeal. If the decision relate to a matter of fact, the evidence respecting it may be entirely different on the second trial, and a different question be thus presented on the second appeal. It is only where the evidence is the same, that the decision of the appellate Court would be conclusive. But if the decision relate to a matter which cannot be thus presented under a different aspect —as the construction of a contract or a statute—the first decision of the appellate Court is conclusive upon the second trial and second appeal, whether the action be for the possession of real property, or for any other object. Thus, for example; if the plaintiff claimed to recover in ejectment upon an instrument which he asserted to be a lease of the premises, the decision as to the effect of such instrument in conferring a right to the possession would be final.

That the doctrine does not extend to cases involving questions of a public nature is asserted, on the ground that the decision of such questions is not confined to the parties immediately before the Court, but may affect vast interests of others. It is difficult to perceive how the inconclusiveness of a prior decision in the same case can be said to follow from the importance of the questions involved, or the interests which other parties may have in their determination. The importance of the questions involved should induce careful consideration in the first instance, but can have no effect upon the conclusiveness of the decision when made. When the decision operates as a judgment, it is final upon the rights of the parties, whether

rendered upon full argument and consideration or otherwise, and whatever may be the character of the questions passed upon; when it is relied upon as authority, the case is different, and its weight as authority will depend upon various considerations.   The cases cited by counsel do not support their position.   In *Hammond's Lessee* v. *Inloes,* (4 Md. 165) the Court quote the language of a previous opinion of Mr. Justice Earle, in *Hammond* v. *Ridgely,* (5 Harr. & John. 278) in which he says: "The solemn adjudication of an appellate Court of last resort ought, on general principles of judicial propriety, to be approached with caution; and perhaps they should never be disturbed, except to settle some great rule of property the public interest requires to be reviewed.   On a second trial in ejectment between the same parties and those claiming under them, on the same subject matter, I should say they ought to be considered conclusive; unless, which is hardly a supposable case, glaring injustice has been done, or some egregious blunder has been committed."   This language is supposed to recognize the position of counsel, but on examining the case from which the citation is made, (*Hammond* v. *Ridgely*) we find that Mr. Justice Earle had reference to the force of the adjudication in a second action between the same parties, and not to its effect on a second trial of the same action.   And even in that case, immediately following the passage we have cited, the Justice adds: "If an exposition is given to a will or deed fully defining the rights of the parties, or any other opinion is expressed settling the title to the thing in dispute between them, it should be deemed irrevocable and never again touched, where the same persons and those claiming under them are concerned in the contestation.   Richard Ridgely, the lessor of the plaintiff, was for every substantial purpose a party to the ejectment formerly decided in the Court of Appeals between Daniel Dorsey and Rezin Hammond, and if that Court have disposed definitively of the subject, and fully and explicitly determined the rights of the parties, this Court ought to yield to the judgment, whatever our individual opinions may be of its correctness."   In *Martin* v. *Hunter's Lessee,* (1 Wheat. 355) Mr. Justice Story, in delivering the opinion of the Court, said: "In ordinary cases, a second writ of error has never been supposed to draw in question

the propriety of the first judgment, and it is difficult to perceive how such a proceeding could be sustained upon principle. A final judgment of this Court is supposed to be conclusive upon the rights which it decides, and no statute has provided any process by which this Court can revise its own judgments. In several cases which have been formerly adjudged in this Court, the same point was argued by counsel, and expressly overruled. It was solemnly held that a final judgment of this Court was conclusive upon the parties, and could not be reëxamined. In this case, however, from motives of a public nature, we are entirely willing to waive all objections, and to go back and reëxamine the question of jurisdiction as it stood upon the record formerly in judgment. We have great confidence that our jurisdiction will, on a careful examination, stand confirmed, as well upon principle as authority."

It will be thus seen that Mr. Justice Story expressly holds that the former judgment could not be reëxamined, though the Court was willing to waive the objection and reëxamine the original question. Under this view of the power of the Court, it is hardly to be supposed that a reëxamination would have been made if the objection had been urged by counsel; or if made, that a different conclusion reached would have affected the previous decision, except as an authority in other cases.

But notwithstanding the former decision of this Court, in the present case, was conclusive upon the rights of the parties under their respective grants on the second trial, and is conclusive on the present appeal, we have carefully considered the argument of the learned counsel of respondents, and reëxamined our former decision in the light of that argument, in order, if found to be erroneous in any particular, we might point out the error, and prevent the decision from becoming an authority in other cases.

The main proposition of counsel is that the patent of the United States is only a release—a quit claim—a mere relinquishment on the part of the Government, binding none except the United States and the claimants. If this can be sustained, the other questions become immaterial. If sustained, the defendants, whether claiming under the Alcalde grants or not, are third persons within the fifteenth section of the Act of Congress. Treated as the simple

deed of the United States, we admit that the operation of. the patent is only that of a quit claim, or rather of a conveyance of such interest as the United States possessed; the deed taking effect by relation at the date of the presentation of the petition of the patentees to the Board of Land Commissioners.  We have never asserted any other efficacy to the instrument as a deed; nor do we assert any other efficacy now.  As a deed, its operation is like that of the deed of any other grantor; it passes, and can only pass, such interest as the grantor possessed.  But the patent is not merely a deed of the United States; it is a record of the Government; of its action and judgment with respect to the title of the patentees existing at the date of the cession.  The acquisition of California by the United States did not affect the rights of the inhabitants to their property.  The inhabitants retained all such rights, and were entitled, by the law of nations, to protection in them to the same extent as under the former Government.  ( *United States* v. *Percheman,* 7 Pet. 86 ; *Strother* v. *Lucas,* 12 Id. 435 ; *Teschemacher* v. *Thompson,* 18 Cal. 22.)  But independent of the obligations thus arising, the United States by the treaty of Guadalupe Hidalgo in effect stipulated for such protection.  And the term property, as applied to lands, embraces all titles, legal or equitable, perfect or imperfect.  " It comprehends," said the Supreme Court in *Soulard* v. *United States,* " every species of title, inchoate or complete.  It is supposed to embrace those rights which are executory, as well as those which are executed.  In this respect the relation of the inhabitants to their Government is not changed.  The new Government takes the place of that which has passed away." (4 Peters, 511.)  It is, therefore, of no moment whether the title which passed to the plaintiff and Vallejo by the Mexican grant, be regarded as perfect or imperfect; it constituted property, and as such the obligation to protect it was cast upon the United States, upon the cession of the country, both by the law of nations and the stipulations of the treaty.  The obligation was political in its character, binding upon the conscience of the new Government, and of course could only be executed in such manner and at such times as the Government in its judgment might deem expedient.  By the Act of March 3d, 1851, the Government has determined the manner

and conditions under which it will discharge this obligation, and at the same time has provided the means to ascertain and separate private claims from the public lands.   For both of these objects the act was passed ; and hence, all titles, legal or equitable, are subjected to examination.   Every person, says the act, claiming lands in California " by virtue of any right or title derived from the Spanish or Mexican Government, shall present the same to the Commissioners."   Legal titles—such as were perfect under the former Government—did not need any action of the new Government for their protection, but their presentation was necessary to enable the new Government to ascertain the extent of the property it had acquired by the cession of the country.   Equitable titles required further action of the granting power for their protection, and their presentation was necessary to enable the new Government to discharge its political obligations in this respect.   The action of the Government upon the title presented, necessarily took effect upon that title as it existed at the time the jurisdiction of the former Government over the subject ceased, and it matters not, therefore, whether such jurisdiction be deemed to have ceased at the date of the conquest, or at the date of the treaty.   The new Government succeeded to the obligations of the former Government with respect to the property claimed.   Those obligations devolved upon the United States as a sovereign nation.   The law of nations bound them as a nation, and as a nation they made the treaty.   Their power to enforce the obligation is therefore sovereign and supreme, and subsequent claimants must necessarily take in subordination to their action.   To contend that subsequent claimants can control or question the action of the Government in this respect, is to deny the supreme and sovereign authority of the nation in the enforcement of the obligations assumed by the treaty, or cast upon it, independent of the treaty, by the law of nations.   But as such sovereign and supreme authority cannot be denied or questioned, subsequent claimants must take subject to the result of the proceedings of the Government; and they are not entitled to any notice of the proceedings.   As we said in *Teschemacher* v. *Thompson*, (18 Cal. 25) the sovereign power can " afford the requisite protection in its own way ; it can do so by a direct legislative act perfect-

ing at once the equitable title, or by authorizing proceedings to be taken before its tribunals and officers; and it is under no more obligation to give notice to parties asserting subsequently acquired interests in the one case than in the other.   Nor can subsequent claimants have any just grounds of complaint, for whatever interests they may possess were acquired with full knowledge of the treaty and the obligations and powers of the new Government."

The patent is the evidence which the Government furnishes the claimant of its action respecting his title.   Before it is given, numerous proceedings are required to be taken before the tribunals and officers of the Government; and it is the last act in the series, and follows as the result of those previously taken.   It is, therefore, record evidence of the Government's action.   By it the Government, representing the sovereign and supreme power of the nation, discharges its political obligations under the treaty and law of nations.   "By it," as we said in the case already cited, "the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located, or might have been located by the former Government, and is correctly located by the new Government, so as to embrace the premises as they are surveyed and described."

As against the Government, this record, so long as it remains unvacated, is conclusive; as against the Government it imports absolute verity.   And it is equally conclusive against parties claiming under the Government by title acquired subsequent to the time at which the obligations of the Government attached; otherwise, the power of the Government to enforce the stipulations of the treaty, and the obligations imposed by the law of nations, would be limited and dependent, and not, as they are, sovereign and supreme.   And it is in this effect of the patent as a record of the Government, that its security and protection chiefly lie.   If parties asserting interests in lands acquired since the acquisition of the country could deny and controvert this record, and compel the patentee in every suit for the recovery of his land to establish the validity of the grant, his right to a confirmation of his claim thereunder, and the correct-

ness of the action of the officers of the Government in the survey
and location of the grant, the patent, instead of being an instrument
of quiet and security to the possessor, would become a source of
perpetual and ruinous litigation.    The patentee would find his title
recognized in one suit and rejected in another, and as we said in
*Moore* v. *Wilkinson,* his land located, if the title were recognized,
in as many different places " as the varying prejudices, interests or
notions of justice, of witnesses and jurymen might suggest."    If
the position of the counsel of the respondents is correct, that the
patent has no other effect than as a mere quitclaim of the Govern-
ment, the patentee would be compelled to make such proofs as to
his grant and its location; for every fact upon which the decree
and patent rest would be open to contestation.    The alleged pre-
emptioner under the Acts of Congress ; the locator of a school
warrant; the intruder even, resting solely upon his possession, might
insist upon the proofs on the part of the patentee.    Each of these
classes is a third party according to the position of counsel, and
might insist that the grant conferred no title and was not properly
located, and therefore he could not be disturbed in his possession
by the patentee.    But if this be not so, who are the third persons
mentioned in the fifteenth section, against whom the decree and
patent are not conclusive ?    We answer : They are not intruders,
nor preëmptioners claiming under the laws of Congress, nor locators
of school warrants, nor any other persons whose interests have been
acquired since the acquisition of the country, when the obligation
to protect existing rights of property devolved upon the United
States.    But it is said that the Alcalde grants under which the
defendants claim were issued during the military occupation of the
country, in 1847, before the treaty of Guadalupe Hidalgo.    This
is true ; but the fact does not alter the matter.    The obligation of
protection was cast upon the United States by the law of Nations,
upon the displacement of the Mexican authorities.    The treaty also
took effect upon property as it existed when the control of Mexico
over it ceased.    It extended to all property which was formerly
under Mexican jurisdiction, and of which the United States took
possession.    If the *de facto* officers of the pueblo of San Francisco,
during the temporary military occupation of the country, possessed

any authority to dispose of lands within the pueblo, it was subject to the right and power of the Government to execute its obligations as successor of Mexico, and to make any treaty respecting the same. The term " third persons " refers not to all persons other than the United States and the claimants, but to those who hold independent titles arising previous to the acquisition of the country. The latter class are not bound by the decree and patent, for they do not hold in subordination to the action of the Government, nor by any title subsequent, but by title arising anterior to the conquest.

The respondents cite as authority for their position the opinions expressed by certain members of the Senate of the United States, when the Act of March 3d, 1851, was under discussion before that body. These opinions, say the learned counsel, show " not only the effect, but the absolute limitation which Congress intended " the patent should possess. We do not think so ; on the contrary, they only express the views entertained by individual members of one body of the national legislature. Other Senators, who did not participate in the discussion of the subject, may have held different views as to the effect and operation of the patent; a majority of the Senate even may have held different views ; and the general opinion of members of the House of Representatives may have differed entirely from that of Senators, both of those who spoke and of those who simply voted on the subject. It is evident that the opinions expressed by individual legislators upon the object and effect of particular provisions of an act under discussion are entitled to very little weight in the construction of the act. The intention of the legislature must be sought in the language of the act—and the object expressed or apparent on its face—and not by the uncertain light of a legislative discussion. (See note to section 407 of Story on the Constitution.)

The authorities cited by counsel do not conflict with the views we have expressed. We do not question the correctness of the rule laid down by the Supreme Court in *Garland* v. *Winn*, (20 Howard, 8) ' that where several parties set up conflicting claims to property, with which a special tribunal may deal, as between one party and the Government, regardless of the rights of others, the latter may come into the ordinary Courts of justice, and litigate the

28

conflicting claims." We simply assert that the rule has no application to claims acquired subsequent to the acquisition of California. At that date the duty devolved upon the United States to protect all existing rights of property. Subsequently acquired rights, as we have already said, are therefore held in subordination to the action of the new Government with respect to the rights acquired under the former Government. It is only with reference to rights of property acquired under that Government that the new Government takes any action, and its judgment is that the Mexican Government conferred upon the claimant certain property which it is bound to protect. The State and individuals hold whatever property they possess which formerly belonged to the Mexican Government, through the United States, and necessarily, therefore, in subordination to the action of the United States whilst they held it, and in subordination to any action with respect to such property which they covenanted or were bound to take upon its acquisition. The legal effect of the action of the Government is the same as if such action had been taken the very day upon which the Mexican authorities were displaced.

On the trial, special issues were submitted to the jury, and in addition to the general verdict for the defendants, findings upon these issues were rendered. The plaintiff moved the Court for judgment upon the special findings, but the Court overruled the motion. We think the motion should have been granted. Special findings always control the general verdict, and if the latter is inconsistent with the former, the latter must be displaced. Such is the case here. The facts found authorized a judgment for the plaintiff.

The judgment must therefore be reversed, and the Court below directed to enter judgment for the plaintiff upon the special findings for the premises in controversy, pursuant to the prayer of the complaint.

Ordered accordingly.

NORTON, J. having formerly been counsel for the plaintiff with reference to the property in controversy, did not sit in the case.