## Case No. 1,447.

### BISSELL v. HENSHAW et al.

[1 Sawy. 553.] [1]

Circuit Court, D. California. April 12, 1871. [2]

LIMITATION OF ACTIONS—MEXICAN GRANTS—LIMITATION ACT OF 1863, CALIFORNIA—WHAT FINAL CONFIRMATION—JURISDICTION — GENERAL LAND OFFICE—SURVEY BOGA GRANT—JURISDICTION—FINAL LOCATION—ESTOPPEL BY MATTER IN PAIS—PROCEEDINGS UNDER ACT 1860—JUDICIAL—IN REM, WHO MUST COME IN — TWO GRANTS LOCATED ON SAME LAND.

1. Section 7, of the statute of limitations of California, as amended in 1855, has no application to actions for the recovery of land. Section 6 is the only one applicable to such actions.

[See U. S. v. The Science, Case No. 16,239.]

2. Under the proviso to section 6, a party claiming title under a Mexican grant, can commence his action to recover the land at any time within five years after the final confirmation of the grant.

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [Affirmed by supreme court in 18 Wall. (85 U. S.) 255.]

3. The said proviso to section 6, refers to plaintiff's, not the defendant's, title.

4. The provisions of section 6, of the statute of limitations of 1863, are, substantially, the same on this point as section 6 of the act of 1855.

[Cited in Palmer v. Low, Case No. 10,693.]

5. The issuing of the patent is the final confirmation within the meaning of the statute of 1855, in all cases where the survey is not confirmed by the district court, in pursuance of the act of congress of June 14, 1860 [12 Stat. 34, § 5]; but, in those cases wherein the survey is confirmed under the provisions of said act of congress, the date of final confirmation is the date when the decree of the court approving the location becomes final.

[Cited in Le Roy v. Carroll, Case No. 8,266; Southern Pac. R. Co. v. Dull, 22 Fed. 496.]

6. These definitions of final confirmation were adopted in express terms in section 7 of the statute of limitations of 1863.

7. The commissioner of the general land office has jurisdiction to revise or set aside a survey of a Mexican grant, made by the United States surveyor-general for the state of California, under the act of congress of March 3, 1851 [9 Stat. 632].

8. The survey of the Boga grant having been made and approved by the United States surveyor-general for California, and returned into the district court prior to June 14, 1860, and the said survey being on that day pending in said court, for the purpose of contesting or reforming the same, it is one of the cases made subject to the provisions of the act of congress of June 14, 1860 [12 Stat. 33], relating to the subject, and the district court had jurisdiction to revise said location.

9. But, conceding that the district court had not jurisdiction, then the issuing of the patent is the final location, and the statute of limitations did not begin to run till the date of the patent, October 5, 1865. In either case the action was commenced in time.

[Cited in Hayner v. Stanly, 13 Fed. 226.]

10. The government having finally located the Boga grant, so as to include the lands in question, against the protest of the claimant, Larkin, the former selection by said Larkin of other lands, and disclaimer as to these, do not now estop him or those in privity with him, from setting up the title derived under their patent, as against the claimants under the subsequent grant to Fernandez, located on the same land after said selection and disclaimer, and before the final location of the Boga grant.

11. Proceedings to confirm surveys of Mexican grants by the United States district court under the act of congress of June 14, 1860, are judicial in their nature; and the judgments therein are conclusive upon all parties thereto, and those who are required to make themselves parties.

[Cited in Manning v. San Jacinto Tin Co., 9 Fed. 730; Mora v. Nunez, 10 Fed. 634.]

12. The proceedings under said act of June 14, 1860, are in the nature of proceedings in rem, and all parties claiming any interest must intervene for the protection of such interest, or be concluded.

[Cited in Southern Pac. R. Co. v. Dull, 22 Fed. 496.]

13. There were two Mexican grants of land within the same exterior boundaries, one for five leagues, made February 21, 1844, and the other for four leagues, made June 12, 1846. The former was presented to the board of land commissioners for confirmation March 24, and the latter, March 19, 1852. The decree of con-

firmation became final in the former, February 9, and in the latter, March 2, 1857. The location of the junior grant was made by the surveyor-general, and approved by the commissioner of the general land office, and became final by the issuing of the patent, October 14, 1857. The elder grant was located by the district court under the provisions of the act of congress of June 14, 1860, and became final June 26, 1865, and the patent issued October 6, 1865. The two patents overlapped to the extent of one square league. *Held*: that the patentees under the elder grant, though it was the last finally located and patented, have the better title.

[See note at end of case.]

At law. This was an action [of ejectment] to recover a league of land. It was tried by the court without a jury. The following is a summary of the facts condensed from the findings filed by the court: The plaintiff [George B. Bissell] claimed title under a Mexican grant of five leagues of land, made to Charles William Flugge, which was duly presented to the board of land commissioners, finally confirmed and patented to Thomas O. Larkin. The land granted is called the Boga Rancho. The defendants [J. M. Henshaw and others] also claimed title under a Mexican grant to Dionisio and Maximo Fernandez, of four leagues of land, the same being commonly called the Fernandez grant. This grant was also duly presented to the board of land commissioners, confirmed and patented. The patents overlap to the extent of one league—the north league of the Boga grant, the land patented to Larkin, being coincident with the south league of the land patented to Fernandez and others.

Both of the original grants called for a specific quantity of land within designated boundaries, and both diseños cover, in part, at least, the same general tract of land. The plaintiff's grant for five square leagues bears date February 21, 1844, and purports to have been approved by the departmental assembly, June 13, 1845. The defendants' grant for four leagues bears date June 12, 1846, and has no approval of the departmental assembly. The latter was presented to the board of land commissioners March 19, and the former March 24, 1852. Both grants were confirmed by the board of land commissioners on the same day, July 17, 1855. An appeal having been taken in the case of the Boga (plaintiff's) grant, it was dismissed, and the decree of the board confirming said grant became final, February 9, 1857. An appeal in the case of the Fernandez (defendants') grant having also been taken, the decree of confirmation was affirmed by the district court, March 2, 1857, which decree became final March 9, 1857. The survey of the Fernandez grant was approved by the United States surveyor-general of California, May 29, 1857, which survey having been approved by the commissioner of the general land office, became final, and the patent of the United States duly issued in accordance

therewith, October 14, 1857. The survey of the Boga (plaintiff's) grant having been afterward made and approved by the United States surveyor-general, March 26, 1858, said survey was set aside by the commissioner of the general land office as erroneous, and a new survey ordered.

A second survey having been made and approved by the United States surveyor-general, October 4, 1859, the United States contested said survey, and on application of the United States district attorney, made on the same day, the district court of the United States for the northern district of California, directed the said surveyor-general to return said survey into said court, and said survey having been returned into court, in pursuance of said order, such proceedings were subsequently therein had, under the act of congress June 14, 1860, that a survey of said grant was approved by said district court, January 15, 1863, which said survey became final by dismissal of the appeal, June 26, 1865, and afterwards, a patent of the United States issued in accordance with said final survey, October 5, 1865. Thus it will be seen, that the plaintiff claims under the elder grant; that the junior grant of defendants was first presented to the land commission; that the decree of confirmation of the elder grant first became final, and that the survey of the junior grant was first made, and first became final, and the patent in accordance therewith first issued, the defendants' grant being thereby first finally and definitely located and segregated. The plaintiff's grant had been twice located by the surveyor-general after confirmation, and, also, preliminarily, before confirmation, so as not to interfere with the final location of the defendants' grant, with all of which locations the claimants thereunder were satisfied; but said locations were changed, on the motion of the United States against their opposition, and finally located against the wishes and opposition of the claimants, so as to include the south league of the land already covered by defendants' location and patent. Flugge, in his petition, asked for a tract of land "situate on the western side of Feather river, and stretching along the said river from 39 degrees 33 minutes 45 seconds north latitude, to 39 degrees 48 minutes 45 seconds, and forming on this line a square one league in breadth. It is called Boga, as it is rendered manifest by the annexed sketch." The diseño annexed to the petition, which is an unusually accurate one of the territory embraced in it, lays down the line of latitude, as intended for the first parallel mentioned, and the surrounding country, as it stands related to the parallel. The grant was made in accordance with the petition, making the first named parallel, as located, the "first boundary." It turned out that the line, as laid down on the diseño, is not the true location of the parallel of latitude 39 degrees 33 minutes 45 seconds—the

true location of that parallel being several leagues to the northward of the line, as located on the diseño. There could be no difficulty in locating the grant, after ascertaining the southern boundary, for it was to stretch along the western side of Feather river, five leagues in length, by one league in breadth. Larkin claimed, and the surveyor-general, who first located the Boga grant, supposed, that the true location of the parallel, 39 degrees 33 minutes 45 seconds, must be taken as the southern boundary, and the grant was first located in conformity with that view.

This view, however, evidently located the grant entirely beyond the limits indicated on the diseño, and was erroneous. U. S. v. Sutter, 21 How. [62 U. S.] 176; Id., 2 Wall. [69 U. S.] 585. But it was so first located. The Fernandez grant had been already located to the southward, and in part, at least within the diseño of the Boga grant. The commissioner of the general land office, and afterwards the district court, held that the parallel of latitude, as laid down on the diseño of the Boga grant, with reference to other unmistakable natural objects must control, rather than the true location of the parallel as designated by the number of the degree. But before the decision, the Fernandez grant had been finally located and patented, and the Boga grant was subsequently located by the decree of the district court, mostly to the southward of the Fernandez location, but overlapping it on its southern part to the extent of one league. The second survey of the Boga grant, made under the instructions of the commissioner of the general land office, approved by the surveyor-general, October 4, 1859, and which was ordered to be returned into the district court, was located entirely to the southward of the location of the Fernandez grant, and included none of the land covered by the latter, as finally located. The monition mentioned in the findings issued after the return of said survey into the district court, and default was entered against those failing to appear, before said survey was modified as finally approved. The claimants under the Fernandez grant did not appear in answer to said monition in any of said proceedings in the district court.

Wm. H. Patterson and Chas. H. Sawyer, for plaintiff.

R. Aug. Thompson and P. Ord, for defendants.

SAWYER, Circuit Judge. The question is, which grant takes the land? Some questions raised by counsel, not wholly depending upon the several grants and patents, will be first considered; and firstly, it is insisted that the action is barred by the statute of limitations.

If I understand the argument of counsel, it is claimed that section 7, and not section 6, of the statute of limitations, as amended in 1855 (Stat. 1855, p. 100, §§ 1 and 2), before its repeal, applied to the case; that section 6 of the act of 1863, carries out the same idea in its second proviso (Stat. 1863, p. 327, § 6); and that the statute commenced to run from the time of the final confirmation of the defendants' grant, they having been in adverse possession under their grant from the year 1852.

In this view, I am satisfied, counsel are in error. It is settled by the supreme court of California, that section 7 of the statute of limitations, as it existed prior to the amendment of 1863, had no application whatever to actions for the recovery of lands; and that section 6 was the only section applicable to such actions. Richardson v. Williamson, 24 Cal. 299; Hibberd v. Smith [39 Cal. 145].

Under section 6, a party claiming title derived from the Spanish or Mexican government, can maintain his action, if commenced at any time within five years after the final confirmation of his grant by the government of the United States. Id.; also, Davis v. Davis, 26 Cal. 46; Reed v. Spicer, 27 Cal. 58.

The proviso to the 6th section refers to the plaintiff's title, and says nothing about the defendant's title. Under this provision it matters not how long the defendants may have been in possession, or under what character or title they claim, if the plaintiff commences his action within the time prescribed after a final confirmation of his own title. And there is nothing in section 6, of the act of 1863, to change the aspect of the question.

The second proviso in that section covers the ground of the provisos of both sections 6 and 7 of the statute of limitations, as they before existed. Stat. 1863, p. 327, § 6. The proviso is as follows:

"Provided, further, that any person claiming real property, or the possession thereof, or any right or interest therein, under title derived from the Spanish or Mexican governments, or the authorities thereof, which shall not have been finally confirmed by the government of the United States, or its legally constituted authorities, more than five years before the passage of this act, may have five years after the passage of this act in which to commence his action for the recovery of such real property, or the possession thereof, or any right or interest therein, or for rents or profits out of the same, or to make his defense to an action founded upon the title thereto; and provided, further, that nothing in this act contained shall be so construed as to extend or enlarge the time for commencing actions for the recovery of real estate, or the possession thereof, under title derived from the Spanish or Mexican governments, in a case where final confirmation has already been had, other than is now allowed under the act to which this act is amendatory."

It is settled by the supreme court of California that final confirmation, as used in the statute as amended in 1855, in cases where the survey is not confirmed by the district

court, under the act of 1860, is the issuing of the patent, and that the statute commences to run only from the date of the patent. Johnson v. Van Dyke, 20 Cal. 229; Davis v. Davis, 26 Cal. 46; Reed v. Spicer, 27 Cal. 58; Beach v. Gabriel, 29 Cal. 584.

But where the survey was finally confirmed by the courts, under the act of congress of June 14, 1860, the final confirmation was held to be the date when the decree of the court approving the location became final. Mahoney v. Van Winkle, 33 Cal. 457; Hibberd v. Smith [39 Cal. 145].

Section 7 of the act of 1863, adopted by express provision these definitions, thus laid down by the court, of the term "final confirmation," as used in the statute. It provides, that final confirmation shall be deemed the patent, or the final determination of the official survey under the act of congress of June 14, 1860.

In this case, the decree of the district court confirming the location of the Boga rancho became final, June 26, 1865, and the patent issued October 5, 1865.

Supposing either of these dates to be the date of their final confirmation, there was no final confirmation of the survey of the Boga grant, until long after the passage of the act amending the statute of limitations in 1863; and, at the date of the passage of that act, the statute had not begun to run. If the district court had jurisdiction of the survey, the first would be the date of final confirmation, otherwise, the second.

The plaintiff, under the proviso of that act, consequently, had either five years from the passage of the act (April 18, 1863), as some maintain, or five years from final confirmation—that is to say, either from June 26, or October 5, 1865, within which to commence his action. The action was commenced on the fifteenth of May, 1867, within the time, whichever of these dates is assumed as the correct one, from which the statute began to run.

It is, also, insisted by defendants' counsel, that under the act of congress of 1851 [9 Stat. 633], creating the board of land commissioners, the surveyor-general was the party authorized to locate the land; that the commissioner of the general land office had no authority to revise or control the location so made by the surveyor-general; that the location of the Boga grant, approved by J. W. Mandeville, March 26, 1858, was final; that the subsequent setting aside of said location by the commissioner of the general land office, and all subsequent locations, and proceedings by the surveyor-general and district court are void for want of jurisdiction; and that the statute of limitations began to run from said March 26, 1858.

But it is sufficient to say that, in Castro v. Hendricks, 23 How. [64 U. S.] 440–443, the supreme court of the United States held otherwise—a case in which the point is directly involved, and decided.

This case is not overruled in U. S. v. Sepulveda, 1 Wall. [68 U. S.] 104, as counsel claim, but on the contrary it is affirmed on this point, for it is expressly stated by the court that the commissioner of the general land office is invested with a "supervision over the acts of all subordinate officers charged with making surveys." Id. 107. And again, in the same case: "If the survey does not conform to the decree of the board, the remedy must be sought from the commissioner of the general land office before the patent issues." Id. 109.

I know of no subsequent case which calls this view in question. It is, therefore, conclusive on this court, whether right or wrong, but I think it clearly right.

It is also insisted that the district court had no jurisdiction to order the cause into court, or to take any of the subsequent proceedings had in that court, which resulted in the survey, as finally approved by that tribunal, and in the patent issued in accordance with said approved survey. The survey was, doubtless, ordered to be returned into the district court, upon the supposition that the jurisdiction of the court over such matters had been determined by the supreme court, in the case of the U. S. v. Fossatt, 21 How. [62 U. S.] 445, and the approval of this decision in Castro v. Hendricks, 23 How. [64 U. S.] 442.

As the decree from the appeal of the board of land commissioners had been dismissed, and the case was no longer pending in the district court, at the time the plat and survey was ordered to be returned into court, it would seem, from the case of U. S. v. Sepulveda [supra], that the matter was not, at the time the order was originally made, within the jurisdiction of that court. But the order had, in fact, been made, and the plat had been returned into the district court, and the proceeding to rectify the survey was actually pending in that court, June 14, 1860, when the act of congress of that date entitled "An act to amend an act to define and regulate the jurisdiction of the district courts of the United States in California, in regard to the survey and location of confirmed private land claims," was passed, and took effect.

Section 6 of said act provides as follows: "And be it further enacted, that all surveys and locations heretofore made and approved by the surveyor-general of California, which have been returned into the said district courts, or either of them, or in which proceedings are now pending for the purpose of contesting, or reforming the same, are hereby made subject to the provisions of this act, except that in the cases so returned or pending, no publication shall be necessary on the part of the attorney-general." 12 Stat. 34, § 6.

This case comes within the express provisions of that section. It was a case in which the survey had been "made and approved by the surveyor-general of California," and it had "been returned into the district

court," and proceedings were then "pending for the purpose of contesting, or reforming, the same," and it is, therefore, one of the cases "made subject to the provisions of this act." It is one of the exceptions referred to by the court in U. S. v. Sepulveda.

Jurisdiction to proceed was given by the act, and the subsequent proceedings were in accordance with its provisions. It was so held by the supreme court in a similar case. U. S. v. Halleck, 1 Wall. [68 U. S.] 453.

But even if it were not so, the survey had not been submitted to the commissioner of the general land office, and had not received his approval, and the survey and plat finally approved by the district court, was approved and duly authenticated by the surveyor-general, transmitted by him to the commissioner of the general land office, and by him acted upon as correct, and adopted, and the patent issued in accordance therewith, this being the only survey and plat ever approved by that officer.

Therefore, aside from the action of the district court, the survey did not become final till the patent issued, within the meaning of the statute of limitations, as settled by the supreme court of California, and the construction of that court of a statute of California, is conclusive upon this court. Whether the action of the district court was efficacious or not, the survey approved by the court was adopted by the commissioner of the general land office, and became final by his action, if it was not so before.

The plaintiff is not estopped by the acts of Larkin in making his selection and claiming his land where it was first located, or any other of his acts connected with that location.

The land was located twice, besides the preliminary location, by the surveyor-general, without interfering with the location of the Fernandez grant, either of which locations he would have accepted, and he each time opposed the change, but it was finally located by the district court, upon a contest by the government, and against the claimants' opposition, as it was patented, and so as to conflict with the prior location of the Fernandez grant.

There is nothing in this case upon the question of estoppel, to take it out of the rule as indicated in Moore v. Wilkinson, 13 Cal. 488; Boggs v. Merced Min. Co., 14 Cal. 279; and Davis v. Davis, 26 Cal. 40.

We come now to the great and highly important, as well as interesting, question in the case—a question likely to arise in other cases, involving large amounts of property, to wit: Which grant, under the facts of the case, carries the title to the land covered by both patents?—the elder grant, last presented to the board of land commissioners for confirmation, and last located and patented, though first confirmed, or the junior grant, first presented for confirmation, and first finally located and patented?

Although there are many decisions bearing more or less directly upon the question, this is the first time, so far as I am aware, that this precise question has been presented for determination in an action of ejectment between two conflicting patents, issued upon confirmed Mexican grants, in the national courts. Under the authorities, as they now stand, the question is one of great embarrassment and difficulty. Indeed, I find it no very easy task to reconcile all the views expressed in different cases, having reference to different states of facts bearing upon the question. The claimant, under one or the other of these grants, must lose a league of land, and although it is not easy to determine which has the better right, yet I think principles may be extracted from the cases, which should control the action of this court.

On the part of the defendants, it is insisted that where a grant was made by the Mexican government of a definite quantity of land, without specific boundaries, within a larger area, the right of location remained with the government; that the government was not precluded from making a subsequent grant, with specific boundaries, within the larger area; that such subsequent grant with specific boundaries would take precedence of a prior unlocated grant; that when one of two grants of a specific quantity within a larger area has been located by the government, the grant becomes specific and attaches to the land; that, upon the cession of California to the United States, the right of location of such general grants passed to the United States, and is to be executed according to the laws of the United States; that the grant first located, even if the junior grant, becomes specific by the location, and the title to that specific tract of land vests absolutely in the grantee; that the patent takes effect by relation from the filing of the petition for confirmation with the board of land commissioners; that the grants in question are grants of that kind; that the defendants, having first filed their petition, and secured the first final location, their grant became specific, and attached to the land embraced in their patent, and having the elder patent, taking effect by relation, from the filing of the petition, it is conclusive; and that the plaintiffs are not "third persons" within the meaning of the fifteenth section of the act of congress of March 3, 1851, and are therefore not in a position to dispute their title. The case of Waterman v. Smith, 13 Cal. 407, and the cases therein cited from the United States Supreme Court Reports, of which Fremont's Case, 17 How. [58 U. S.] 558 is one, are relied on as sustaining their view.

On the part of the plaintiff, it is argued that a different rule, or at least a modification of the rule, was laid down by the same court, in the subsequent cases of Leese v. Clark, 18 Cal. 537, 20 Cal. 387, and Teschemacher v. Thompson, 18 Cal. 26; and that

under the rule, as thus established, the elder patent in this case takes the land; and, it is claimed, also, that this view is sustained by the cases of Beard v. Federy, 3 Wall. [70 U. S.] 479; Rodrigues v. U. S., 1 Wall. [68 U. S.] 582; and the cases of Treadway v. Semple, 28 Cal. 652, and Semple v. Wright, 32 Cal. 659, decided upon the authority of Rodrigues' Case.

In Leese v. Clark [supra] the court held that a patent issued upon a confirmed Mexican grant is to be regarded in two aspects: "Firstly—As a deed of the United States. Secondly—As a record of the government, showing its action and judgment with respect to the title of the patentees at the date of the cession." The court say: "As to the operation and effect of the patent, there can be no question. It is the last act of a series of proceedings taken for the recognition and confirmation of the claim of the patentees to the land it embraces, the first of which was the petition to the board of land commissioners. With respect to such proceedings, it takes effect by relation at the date of the first act. As the deed of the United States, it is to be regarded as if it had been executed at that time. It passes whatever interest the United States may then have possessed in the premises." 18 Cal. 570, 571. And again: "Treated as the simple deed of the United States, we admit that the operation of the patent is only that of a quitclaim deed, or rather of a conveyance of such interest as the United States possessed, the deed taking effect by relation at the date of the presentation of the petition of the patentees to the board of land commissioners." 20 Cal. 421. "But the patent is not merely a deed of the United States; it is a record of the government; of its action and judgment with respect to the title of the patentee, existing at the date of the cession. Again, the patent is the evidence which the government furnishes the claimant, of its action respecting his title. Before it is given, numerous proceedings are required to be taken before the tribunals and officers of the government; and it is the last act in the series, and follows as the result of those previously taken. It is, therefore, record evidence of the government's action. By it, the government, representing the sovereign and supreme power of the nation, discharges its political obligations under the treaty and law of nations. By it, as we have said in the case already cited, the sovereign power which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the law of nations and the stipulations of the treaty; and that the grant was located, or might have been located, by the former government, and as correctly located by the new government, so as to embrace the premises, as they are surveyed and described." Id. 423; and [Teschemacher v. Thompson] 18 Cal. 26.

In the latter aspect, then, as a record of the government, according to the view thus expressed, the patent is evidence, not only of the grant, but also, that the land has been "correctly located"—that is to say, that it conveys the very land originally intended to be granted, and it necessarily relates to the date of the original grant.

In Teschemacher v. Thompson [supra] the same court says: "The patent, it is true, as a deed of the United States, takes effect only from the date of the presentation of the petition of the patentees to the board of land commissioners. * * * But as the record of the government, of the evidence and validity of the grant, it establishes the title of the patentees from the date of the grant," etc. And in Stark v. Barrett, 15 Cal. 366: "In addition to this being conclusive upon the question of the existence and validity of the grant, it (the patent) necessarily establishes the title of the patentees from the date of the grant."

The character and effect of the patent, as thus stated, in Leese v. Clark [supra], has also been adopted, and the principle stated, in language almost precisely the same, by the supreme court of the United States, in the case of Beard v. Federy, 3 Wall. [70 U. S.] 491, 492. The court in that case, says: "In the first place, the patent is a deed of the United States. As a deed, its operation is that of a quitclaim, or rather of a conveyance of such interest as the United States possessed in the land, and it takes effect by relation at the time when proceedings were instituted by the filing of the petition before the board of land commissioners. In the second place, the patent is a record of the action of the government upon the title of the claimant, as it existed upon the acquisition of the country. Such acquisition did not affect the rights of the inhabitants to their property. They retained all such rights, and were entitled by the law of nations to protection in them, to the same extent as under the former government. The treaty of cession, also, stipulated for such protection. The obligation to which the United States thus succeeded was, of course, political in its character, and to be discharged in such manner and on such terms as they might judge expedient. By the act of March 3, 1851, they have declared the manner and the terms on which they will discharge this obligation. They have there established a special tribunal, before which all claims to land are to be investigated; required evidence to be presented respecting the claims; appointed law officers to appear and contest them on behalf of the government; authorized appeals from the decisions of the tribunal, first to the district and then to the supreme court; and designated officers to survey and measure off the land when the validity of the claim is finally determined. When informed, by the action of its tribunals and officers, that a claim asserted is valid and entitled to recog-

nition, the government acts and issues its patent to the claimant. The instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it, the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and is correctly located now, so as to embrace the premises, as they are surveyed and described. As against the government, this record, so long as it remains unvacated, is conclusive. And it is equally conclusive against parties claiming under the government by title subsequent. It is in this effect of the patent as a record of the government, that its security and protection chiefly lie. If parties asserting interests in lands acquired since the acquisition of the country, could deny and controvert this record, and compel the patentee, in every suit for his land, to establish the validity of his claim, his right to its confirmation, and the correctness of the action of the tribunals and officers of the United States in the location of the same, the patent would fail to be, as it was intended it should be, an instrument of quiet and security to its possessor."

Upon the provision of the fifteenth section of the act of [March 3] 1851, providing that the decrees of the courts, or patent issued under the act, "shall be conclusive between the United States and said claimants, only, and shall not affect the interest of third persons;" the court in Beard v. Federy [3 Wall. (70 U. S.) 492] further observes, that "the third persons," as there used, does not embrace all persons other than the United States, and the claimants, but only those who hold superior titles, such as will enable them to resist successfully any action of the government in disposing of the property. This, also, is but adopting the language of the supreme court of California in Waterman v. Smith, 13 Cal. 420; Moore v. Wilkinson, Id. 488; Boggs v. Merced Min. Co., 14 Cal. 362, and other cases.

In Waterman v. Smith, the court say: "The third persons * * * are those whose title is, at the time, such as to enable them to resist successfully any action of the government in respect to it. Parties holding claims which may be located without the boundaries of the patent, and still within the limits of the general tract designated in the grants to them, do not constitute third persons." 13 Cal. 420. And, again, in Teschemacher v. Thompson, 18 Cal. 27, the court say that the "third persons" referred to "are those whose title accrued before the duty of the government and its rights under the treaty attached." Again, they "are those whose title to the premises patented not only accrued before the duty of the government and its rights under the treaty attached, but whose title to such premises was, at that date (the date when the duty of the government attached, or date of the treaty), such as to enable them to successfully resist any subsequent action of the government affecting it." Leese v. Clark, 18 Cal. 572. And this is repeated in the same case, on a subsequent appeal. 20 Cal. 412, 413.

And the court further say, in Leese v. Clark: "Unless the government interferes in the matter, the defendants, as junior grantees, are remediless. Their title to the premises was not such, at the date of the treaty, as to enable them to resist the action of the government in the location of the elder grant. They are not, therefore, 'third persons,' within the meaning of the fifteenth section of the act of congress." 18 Cal. 575.

The opinion in Beard v. Federy [3 Wall. (70 U. S.) 492] was delivered by the same learned judge, who, as chief justice of the supreme court of California, delivered the opinion from which the foregoing quotations are made; and the language of that opinion was, doubtless, intended to embody the same idea in the definition of "third persons" therein adopted. According to this comprehensive definition of the learned judge, and the court for which he speaks, as understood and maintained by the defendant, then, no one is a "third person," within the meaning of the said act of congress, except a party who not only holds a Spanish or Mexican grant, but, also, whose grant or title was such at the date of the treaty that he could successfully resist any action of the government in regard to its location, or in any way affecting it. That is to say, no one who, at the date of the treaty, did not have a complete, and in every particular perfect, title to a specific, finally segregated and located tract of land, with all the formalities, including the act of juridical possession, is a "third person," as that term is used in the act of congress, or, in other words, has a status that will enable him to question the conclusiveness, either as to the validity of the grant, or the correct location of the land, of a patent issued upon a confirmed Mexican grant. No party having an inchoate Mexican grant, at the date of the treaty, is a "third person," or has such status; and every such patent is conclusive upon every party whose title was inchoate at the date of the treaty.

The defendants invoke this doctrine, and say that the plaintiff's grant was inchoate; that the plaintiff could not successfully resist the action of the government in respect to his grant, or its location, at the date of the treaty; and that the plaintiff, not being a "third person," the defendants' patent being the elder patent, founded upon a grant first located, though issued to perfect a junior grant, is conclusive.

But under this same rule, thus broadly stated, the plaintiff, with equal force, says that the defendants' grant was inchoate; that defendants' title was not such at the date of the treaty as to enable them to resist the action of the government, affecting

plaintiff's elder grant, or its location; and, therefore, that defendants are not "third persons," with reference to his patent, within the assumed definition of that term; and that plaintiff's patent, issued upon a confirmed elder grant, is conclusive upon defendants for that reason.

Both patents were issued upon grants which were inchoate at the date of the treaty, but nevertheless, both patents cannot be conclusive upon the claimants under the conflicting patents. Both cannot take the land.

It seems evident, therefore, that the problem involved in this controversy must be solved upon some other principle than the doctrine, alone, of "third persons," as thus broadly laid down in the decisions referred to, and as thus understood.

But it is evident that this comprehensive definition of "third persons" was given with reference to the facts of the cases then under consideration, which were actions in which but one of the parties claimed under a patent issued upon a confirmed Mexican grant, and the other set up against the patent, either an unconfirmed and unlocated, or an unlocated confirmed grant, or a claim under the pre-emption laws of the United States, or under some state law alone, or a state law in conjunction with some act of congress, by which some right was claimed to have attached in favor of the party since the date of the treaty with Mexico.

I find no case wherein the question is considered between parties claiming under different patents, issued upon different confirmed Mexican grants, finally located upon the same land; and it, doubtless, never occurred to the court, when considering the question, that such a case would arise. With reference to such a case, it would seem that the construction on this point of the fifteenth section requires some limitation, and a limitation is clearly and expressly recognized in the case of Rodrigues v. U. S., 1 Wall. [68 U. S.] 582, which will be more particularly referred to in a subsequent part of this opinion, and by implication, at least, in other cases.

But to return to the cases of Waterman v. Smith [13 Cal. 420], and Leese v. Clark [18 Cal. 572, 20 Cal. 412, 413], and the different rules supposed to be adopted in other particulars, in these cases, and other cases of a similar character, invoked by the respective parties.

It will be observed that, in none of those cases, did the question arise between two patents founded upon confirmed Mexican grants, located by the tribunals, or officers of the United States government, upon the same land.

In Waterman v. Smith, the contest was between the patentee of a confirmed and located grant on one side, and the holder of an unlocated grant, on the other. One of the grants was for four leagues within a tract of eight or nine leagues, and the other for three leagues, within an area containing twenty leagues. 13 Cal. 383.

No one line in either was fixed, from which the measurement must necessarily commence. The grants were of a certain quantity, without any indication of location, except certain outer boundaries, and one was to join with the other. They were emphatically floating grants, and only one had been located and patented, while the other was still unlocated and afloat, and liable to be located anywhere within the larger area embraced within the diseño, and might, and probably would, be located outside of the land covered by the patent. And, in fact, it was so subsequently located, as will hereafter be seen.

It was with reference to this particular state of facts, that the questions were discussed, and the rule laid down. The patent was simply held conclusive, as against the still unlocated and floating grant. It was nowhere said or intimated that if both grants had been located upon the same land, and patented, the first located, without reference to the priority of the grant, would have been preferred, and the instructions considered and approved, are very carefully limited to the case of a located and patented grant, against one that is unlocated.

Thus, the seventh is as follows: "That the patent in evidence by plaintiffs is conclusive as against the defendant, unless there is evidence that the defendant has a title superior to the title of said patent to the land in controversy, under a confirmed Mexican grant, located under the Mexican government, or under the United States government." [Waterman v. Smith] 13 Cal. 421. See, also, 8th and 9th instructions, Id.

These instructions imply, that if the defendant's grant had been located, either by the Mexican or United States government, the plaintiff's patent issued upon the junior grant, might not have been conclusive. Both parties, then, would have had a title from the same "source of paramount proprietorship" (Id. 419), and the question of superiority might be open. Fremont's Case, also, cited in that case from 17 How. [58 U. S.] 542, was a grant of ten square leagues, to be located in a district of country which contains above one hundred leagues." Id. 573. So the case of Rutherford v. Green [2 Wheat (15 U. S.) 196], and the other cases cited from the United States supreme court, are all essentially floating grants, with no one point fixed with reference to which the land must be located, without leaving any room for the exercise of discretion by the government. The strongest case therein cited, so far as the present question is concerned, seems to be Ledoux v. Black, 18 How. [59 U. S.] 473. But, in that case, the grant was also vague and uncertain, and "one location would answer the calls and descriptions as well as the other." Id. The defendants claimed under an entry made, and patent of the United States issued under acts of con-

gress before the passage of the act of congress under which plaintiff's grantor presented his claim, and the act subsequently passed, under which it was finally confirmed. The court, in that case, only recognize the validity of a sale of a "part of the land not necessarily embraced within the tract confirmed." In all of those cases in which the court was called upon to decide between two claimants, and a patent prevailed, the opposing claim was but a floating one, or the tract claimed and confirmed had not been patented, and did not necessarily include the land embraced in the opposing patent.

The cases of Waterman v. Smith and Leese v. Clark [supra], when considered with reference to the facts of the respective cases, and the questions to be determined, do not appear to be in conflict. In the former, it was only necessary to consider the patent in one of the aspects in which it is said it must be regarded, namely, as a quitclaim deed of the United States, taking effect by relation, at the date of the presentation of the petition, and it was in that aspect alone, that it was, in fact, considered. In that, and similar cases, it was unnecessary to carry the relation further, or to consider whether the patent would take effect by relation to the date of the grant.

In Leese v. Clark, the court evidently does not consider itself as advancing any view in conflict with the decision in Waterman v. Smith. On the contrary, it recognizes that case as correctly decided, and says that while the patent, as a deed of the government, is to be regarded as taking effect by relation at the date of presenting the petition to the board of land commissioners, it is also to be regarded in another aspect, viz: as a record of the government, of its actions, etc., as before stated in this opinion, and in this aspect, that the patent is evidence as to a junior grantee—which was the case then under consideration—of the validity of the grant, of its correct location, and that it relates to the date of the grant. The facts in the case required a consideration of the patent in this aspect—as a record of the action and adjudication by the government—and it was only upon this view that the decision was put by the court, or that it can be sustained. The question was directly involved and decided. The action was ejectment, and the case was this: In 1839, Governor Alvarado granted to Leese and Vallejo a tract of land situate at the "landing place of Yerba Buena," two hundred varas long, by one hundred varas wide. Leese v. Clark. The description was uncertain, as will be seen by an examination of the grant, and it was so held by the court. "That there was such uncertainty in the bounds of the tract as described in the grant in question, is manifest. The location of the line running from the disembarcadero, or landing place, to the playita, or little beach, is one source of uncertainty. That line might be run in several

different directions, materially varying from each other, and yet run, in each instance, in a northerly course from the starting point. There are other sources of uncertainty. A delivery of juridical possession was therefore necessary. This proceeding involved a definite ascertainment of the land to be delivered, and for that purpose required a survey and measurement—in other words, a location of the land. The power of locating the land as a preliminary to its formal delivery, belonged to the government, and could not be exercised by the grantees, at least, so far as to bind the government. * * * It does not appear from the record whether the government ever acted in the matter. Assuming that it did not, the right and power passed to the United States, and could be exercised by them in such manner and at such time as they might deem expedient." [Leese v. Clark] 18 Cal. 574.

This grant was, therefore, inchoate. The description was uncertain, and it was susceptible of different locations, and, like other uncertain grants, required a survey to attach it to any specific tract of land. The grant was made by the governor, directly, and not by the pueblo authorities; and it was therefore held that it was necessary to present it to the land commissioner in the name of the claimant. It was so presented, confirmed, duly surveyed, and, in 1858, patented. Plaintiffs claimed under the patent. The opposing claim was under grants from the alcaldes of San Francisco, made in the month of February, 1847,—[Leese v. Clark] 20 Cal. 396,—before the treaty with Mexico, by which the territory was acquired by the United States. It is settled by numerous cases, that at the date of these grants the alcaldes of San Francisco had power to grant. This power is assumed in the case for the purposes of the decision. It is said, it is true, that this power was granted to the alcalde by the governor and territorial deputation. But so far as the present question is concerned, it matters not from what source the power was derived, if it existed, so the governor derived his power to grant, from some superior source. Both had power to grant, provided the land was subject to grant. The alcalde's power to grant lands within the pueblo, not before granted, was unrepealed, and while so existing, his grant was as effective as that of the governor. The governor himself could no more have granted land, previously granted, without a proper denouncement, than the alcalde. Both, at the time, were empowered to grant lands that were open to grant. At the time that these alcalde grants were made, that portion of the pueblo lands had been laid off into streets, blocks and lots, the lots being fifty varas square, and said fifty-vara lots were designated on said plat by numbers; and grants were made of such lots by their numbers, in accordance with said plat. These alcalde grants were so made, and the

grants being for such fifty-vara lots by their numbers, in accordance with such plat, were, necessarily, of specific and certain tracts of land. They were, necessarily, located and could apply to no other land. The alcalde grant, then, was of a specific tract of land, located by the very act of making the grant, and it required no further action of the government. On the second trial, the judge of the district court acted upon this theory, and assuming that the elder grant, which had been confirmed and passed into a patent, was inchoate, uncertain and unlocated; that the junior grants by the alcalde were of specific tracts and located, and, therefore, first segregated from the public domain, and that the case was entirely similar to the case of Waterman v. Smith [13 Cal. 420], charged the jury in accordance with the law, as he supposed it to be laid down in that case (see [Leese v. Clark] 20 Cal. 394, 396) regarding the patent simply as the deed of the government, etc., but disregarding the other aspect of the patent, as a record of the government, etc., as stated in the same case by the supreme court on the first appeal, and also in the prior case of Teschemacher v. Thompson, 18 Cal. 26.

On the second appeal, the supreme court say, that the district court, among other things, "disregarded the decision as to the operation of the patent as a record of the government, with respect to the title of the patentees at the date of the cession, and declared that the patent had no greater effect or operation than a simple deed of the United States." [Leese v. Clark] 20 Cal. 416.

The supreme court, also, subsequently admit, that if this latter proposition "can be sustained, the other questions become immaterial;" and, although regarding the first decision as conclusive in that case, yet, in order to correct any error the court might have fallen into in reference to future cases, elaborately re-examined the question, and reached the same conclusion as that attained on the former appeal. 20 Cal. 420 et seq. In the course of this re-examination, the court say:

"Treated as the simple deed of the United States, we admit that the operation of the patent is only that of a quitclaim, or rather of a conveyance of such interest as the United States possessed; the deed taking effect by relation at the date of the presentation of the petition of the patentees to the board of land commissioners. We have never asserted any other efficacy to the instrument, as a deed. As a deed, its operation is like that of any other grantor; it passes, and can only pass, such interest as the grantor possessed. But the patent is not merely a deed of the United States, it is a record of the government." Id. 421.

By it, the sovereign power, which alone could determine the matter, declares that the previous grant was genuine; that the claim under it was valid, and entitled to recognition and confirmation by the laws of nations, and stipulation of the treaty; and that the grant was located, or might have been located, by the former government, and is correctly located by the new government, so as to embrace the premises as they are surveyed and described." Id. 423. See, also, [Leese v. Clark] 18 Cal. 571, 572.

It will be seen, then, by careful examination of the case, that the invalidity of the alcalde grant was not put upon a want of power in the alcalde to grant, but a want of power to make a grant, that should affect the title of one who had a prior grant to the same land, or that might be located on the same land—that the subsequent grantee must take his grant, subject to the liability of having a prior grant not yet definitely attached to the specific tract located upon it. It will be seen, also, that it is still held that the doctrine of Waterman v. Smith is correct, so far as it goes—that is to say, as applicable to the facts of that, and similar cases, where a junior grant has been located, and an elder unlocated grant, not necessarily embracing the same land, is still afloat.

But, under the new state of facts involved in that case, when both grants have become specific, and located upon the same land, other principles are involved, and the patent is to be considered in the other aspect as a record of the government, and that as such, it is evidence of the validity of the grant, that it is correctly located, and takes effect from the date of the grant.

The case of Teschemacher v. Thompson, as I understand the case, was decided upon precisely the same principle, and established the same rule, as to the effect of a patent issued upon a confirmed Mexican grant, regarded in the aspect of a record of the government. The plaintiff claimed under a patent, issued under a confirmed Mexican grant, which covered the premises.

The demanded premises were alleged in the answer, and assumed by the court, to have been always, before and at the date of the admission of California into the Union, below the ordinary high tide water mark in the bay of San Francisco. Defendants claimed that the title was, therefore, in the state of California, and not in plaintiffs. For the purposes of the decision, the court assumed that the grant upon which the plaintiff's patent issued, "was only for a specific quantity lying in an area of larger extent; * * * that it conveyed only an interest requiring further action of the government, and that such action was not had previous to the cession; in other words, that it conferred a merely equitable title, which was never perfected under the former government." 18 Cal. 24.

This being so, of course, it was subject to be located differently by the government within the external boundaries indicated in the grant, the full quantity being given. It might have been located wholly above

high tide, excluding the premises in question, and upon the simple theory of the case of Waterman v. Smith, that the Mexican government might have made another grant to other parties of a specific tract of land, within the same external boundaries, it might have made a specific grant of land below high water mark to a third party, and, subsequently, have located plaintiff's grant upon the land above high water mark, and the grantee could not complain. In that event, as the defendants' counsel in the case now under consideration claim, the first grant that became located, even if the junior grant, would take the land. What the Mexican government might have done, the United States, its successor in interest, might do at any time before filing a petition for confirmation. And so the cases cited from the Reports of the U. S. supreme court in Waterman v. Smith, seem to hold.

The United States only covenanted in the treaty to protect the interests of citizens as they existed. not to give them greater rights than they already had under the Mexican government. The United States simply took the place of that government, and succeeded to all its rights and all its obligations respecting those lands.

By the admission of California into the Union, it became, by virtue of its sovereignty, entitled to all the lands below ordinary high water mark, according to Pollard v. Hagan, 3 How. [44 U. S.] 212, and other cases. Whether the transfer of title, which was before in the United States, to the state, is by implied grant or relinquishment, or in what precise way the transfer was effected, does not very clearly appear. But the title is recognized to have become vested in the state by virtue of its admission. And the land to which the title thus passes, is specific, because it is all the land lying below ordinary high tide, and the ordinary line of high tide is a well-marked natural object, which only requires observation to ascertain. The court, however, held in this case, as in Leese v. Clark [18 Cal. 572, 20 Cal. 396], that the state took the title subject to such location as the government should make of the Mexican grant under which the plaintiff claimed, and that this grant having been finally located so as to embrace the premises in question, although it was below ordinary high water mark, and upon land which would otherwise have passed to the state upon its admission into the Union, the patent, "as the record of the government of the existence and validity of the grant, establishes the title of the patentees from the date of the grant." [Teschmacher v. Thompson] 18 Cal. 26. See, also, Stark v. Barrett, 15 Cal. 366.

As I understand these decisions, then, where there are two grants from the paramount source of title, and both have become attached to a specific piece of land, and a patent has been issued by the United States to the elder grantee, in pursuance of a decree of confirmation, under the act of [March 3] 1851, and locations made in pursuance of the acts of congress, the patent under the elder grant carries the superior title.

These cases, it is true, are but decisions of a state tribunal, and are of themselves not controlling authority in the national courts. But the learned chief justice who so elaborately and ably discussed the question in the cases cited, is now a justice of the supreme court of the United States, and, as we have seen, that tribunal, in an opinion delivered by him in Beard v. Federy, 3 Wall. [70 U. S.] 491, 492, has laid down the same rule, in language almost identical.

In speaking of the patent as a record, the court, in that case, say: "This instrument is, therefore, record evidence of the action of the government upon the title of the claimant. By it, the government declares that the claim asserted was valid under the laws of Mexico; that it was entitled to recognition and protection by the stipulations of the treaty, and might have been located under the former government, and it is correctly located now so as to embrace the premises as they are surveyed and described." Id. 492.

The case of U. S. v. Armijo, 5 Wall. [72 U. S.] 444, was an appeal from the final survey of one of the grants involved in Waterman v. Smith—the grant which was unlocated at the time of the trial of that case. The claimants under the Armijo grant, insisted that it was the elder grant, and, that being so, they were entitled to have it so located, that it should embrace a portion of the land already patented to the holders of the Solano grant. To what end, if the grant first located would necessarily take the land? But the priority, in fact, only related to the former title papers. There had been a prior provisional grant to Solano, see Waterman v. Smith, 13 Cal. 375. And, although the formal grant to Armijo was first in date, it referred to the Solano rancho in terms. Solano's rights were recognized in it. And in view of his elder equitable right, the court say:

"There can be no doubt, as observed by the district judge, that under the circumstances the rights of Solano, according to the Mexican usages, would have been recognized as superior to those of Armijo in any contest, notwithstanding the formal title issued first to Armijo." [U. S. v. Armijo] 5 Wall. [72 U. S.] 448.

The court refused to allow the location upon the land before patented, because the parties were not entitled to have it so located, for the reason that Solano had the prior equity, as well as the prior location. But it was nowhere intimated that if it should be so located, the location would be fruitless, because the Solano grant had been first segregated and made specific, as is claimed to have been held between those very grants, in Waterman v. Smith. This omission to intimate any such result, in the opinion by the

same learned judge who rendered the decision in Waterman v. Smith, is, under the circumstances, significant. If he had supposed such consequences would necessarily follow the desired location, he would scarcely have failed to suggest them. But the case of Rodrigues v. U. S., 1 Wall. [68 U. S.] 591, bears directly upon the question. That was an appeal from a decree of the district court, making a final location of a confirmed grant under the act of June 14, 1860. Rodrigues claimed under a grant to one Sanchez, made provisionally in 1838, and ratified by Governor Micheltorena in 1848. In 1842, one Castro obtained a grant which had been finally confirmed, and before the passage of the said act of 1860, finally located and patented. Rodrigues' grant was afterwards surveyed so as not to interfere with Castro's grant as located; but his survey was set aside by the district court, and, under the direction of the district court, another was made and confirmed, which included a large portion of the land before patented to Castro under the decree confirming his grant made in 1842. Rodrigues appealed, and the principal ground of error relied on was, that his grant was so located as to include a large portion of the land already patented to Castro's representatives. If so located, he supposed himself liable to lose the land on that ground; hence his appeal. But the supreme court, on that point, say (page 591):

"It is objected to this location of the grant, that it places it on land which has already been confirmed, surveyed and patented to the representatives of Castro. The answer to this is, that we are called on in this proceeding to determine where the grant to the present claimant ought, rightfully, to be located, who was not a party to any of the proceedings by which Castro's claim was confirmed, surveyed or patented, and is not, therefore, bound or concluded by either the decree, survey, or patent, as expressly enacted by the fifteenth section of the act of [March 3] 1851, for Castro's survey was made before the act of [June 14] 1860, and there was no opportunity for this claimant to contest its location. And lastly, it may be added, that the holder of the Castro claim has made himself a party to the present proceeding, and must be bound by its result."

The very point in the case was, as to the propriety of locating a prior inchoate grant, uncertain as to its exact location, upon land already appropriated to a subsequent inchoate grant in terms covering the same land, but first finally located and patented. And the court unanimously held that it must be so located, and declared that the claimant under the elder patent, being a party to the proceeding, "must be bound by its result;" thereby holding that the claimant under the elder grant, although inchoate, and not such as would enable the grantee, at the date of the treaty, to resist any action of the government affecting its grant or location, is not bound or concluded by the former confirmation, survey or patent, and is, therefore, a "third person," within the meaning of the fifteenth section of the act of 1851. The grant is thus adjudged to be properly located, and the result declared to be conclusive upon the prior patentee—that is to say, that in this instance the elder grant, though subsequently located upon land already confirmed, and patented to the holder of a junior Mexican grant, carries the superior title. And this is the most direct expression of the judgment of the supreme court, affecting the question involved in the case now under consideration, that has thus far been made. The further views as to the character of the patent in the aspect of a record of the government, expressed in Beard v. Federy [3 Wall. (70 U. S.) 491], go to the same result; and these cases both arose under Mexican grants of a similar character in California, and under the same acts of congress, relating to the same subject, and therefore are more important and reliable as authorities than those cases arising under other acts, containing very different provisions, and prescribing very different modes of proceeding relating to lands in Florida, Louisiana, Missouri, and other states formed out of territory acquired from foreign nations.

In U. S. v. White, the supreme court, also, as well as in Rodrigues' Case, recognize the view that any parties claiming under a Mexican grant, though inchoate, are "third persons;" for, in speaking of the conflicting claims which were the subject of observation in that case, the court remarked that the patent issued in that case would only be conclusive on the United States, and would not affect the interests of third parties. 23 How. [64 U. S.] 253. Suppose each claimant in that case had presented his grant independently, and they had both been confirmed and patented, would not the question of title have been open to investigation between them, or would the first grant presented and located, even though the junior grant, have been conclusive on the other?

In the cases of Treadway v. Semple, 28 Cal. 655, and Semple v. Wright, 32 Cal. 666, the question arose in the state courts between two Spanish grants, both confirmed, located, and patented, so as to cover the premises in controversy in those actions. The senior grant was first presented for confirmation, but the junior grant was first located and patented. The final locations were both confirmed by the decree of the district court, the respective claimants being parties to the proceedings.

Citing and following the opinion of the United States supreme court in Rodrigues v. U. S. [1 Wall. (68 U. S.) 591], the supreme court of California held the determination of the district court to be conclusive upon the proper location of the elder grant, and that it took the land, although the junior grant was first located. In the former case the court

say, with reference to the proceedings to locate the grant under the act of 1860 [supra]:

"The proceedings had under this act, after the return of the survey and plat, are strictly judicial in their character. The parties interested have an opportunity to be heard, and those appearing actually are heard, and their rights litigated and adjudicated; and when thus finally determined, we see no reason why the matters determined should not, like all other judicial determinations upon points directly in issue, be regarded as res adjudicata, and be final and conclusive upon the rights of the parties." [Treadway v. Semple] 28 Cal. 659.

It was held that action of the district court was a conclusive adjudication, that the elder grant was properly located and took the land.

This, also, seems to be in strict accordance with the views expressed in Rodrigues' Case. That the proceeding is judicial, there can be no doubt. Under the fourth section proofs are to be taken, "and on hearing the allegations and proofs, the court shall render judgment thereon." These proceedings were also held to be judicial in the Fossat Case, 2 Wall. [69 U. S.] 712.

In the case now under consideration, like Rodrigues' Case, the junior grant under which defendants claim, was first located and patented, and these acts were both accomplished before the passage of the act of [June 14] 1860, so that the plaintiff, who holds the prior grant, was not and could not be in any way a party to the confirmation, location or patent; and, in the language of the supreme court, in Rodrigues' Case, he is "not, therefore, bound, or concluded by either the decree, survey or patent, as expressly enacted by the fifteenth section of the act of [March 3] 1851; for Castro's (in this instance, Fernandez's) survey was made before 1860, and there was no opportunity for this claimant to contest its location." 1 Wall. [68 U. S.] 591.

The plaintiff's (Boga) grant was finally located by the district court under the act of 1860, and the only difference between this and the Rodrigues Case, and the other cases cited from the California Reports is, that the defendants, claimants under the Fernandez grant, did not, in fact, come in and make themselves parties, as they were entitled to do under the act of 1860. But the third section provides, "That before proceeding to take testimony, or to determine on the validity of any objection so made to the survey and location as aforesaid, the said courts shall cause notice by public advertisement, or in some other form to be prescribed by their rules, to all parties in interest, that objection has been made to such survey and location, and admonishing all parties in interest to intervene for the protection of such interest." 12 Stat. 34, § 3.

The monition was duly published in this case, and the default of all parties not appearing entered, in pursuance of the usual practice of the court. This gave the court jurisdiction, the cause being already pending in the court on the passage of the act, and it was properly proceeded with thenceforward under the sixth section.

The proceeding is one somewhat of the nature of a proceeding in rem under the statute, in which all parties were bound to intervene and protect their interests. If not there could be no object in this provision of the act. The proceeding of giving the admonition required would be in vain, if the parties interested were not bound to act upon or notice it. And it is not to be presumed that congress required a vain thing to be performed.

This proceeding by monition and default is recognized by the supreme court in U. S. v. Halleck, 1 Wall. [68 U. S.] 454, and in U. S. v. Estudillo, Id. 716. In the latter case, the district court refused to set aside the default on the application of a party who had neglected to appear in answer to the monition, and, on appeal, the supreme court held that the action of the district "court in this respect is not subject to revision, the opening of the default being a matter resting in its discretion." Id.

This is a recognition of the validity of the default, and, by implication at least, that the parties failing to answer to the monition are bound by the judgment. The court could have no discretion to act in relation to a void thing.

But the defendants say that the survey, when ordered into court, did not touch the land patented to them, and that they, therefore, had no interest in the matter. But they were interested in opposing the very change which the United States, the party at whose instance the survey was ordered into court, sought to have made. The exceptions filed before the monition issued, and the consideration of which was the object sought, particularly pointed out that the survey was erroneous in this, that it did not locate the land, so as to embrace that already patented to defendants. Thus, the exceptions to be considered, did directly affect the defendants' interest, as much as the interests of plaintiff; and it might as well be said, that Larkin had no interest in the matter, as that the defendants had none. Without the exceptions to the survey, there was nothing to consider. They were the very subject-matter upon which the court was called upon to act, and the exceptions specially insisted that the grant should be so located as to cover the land patented to defendants. The defendants were more interested in opposing the exceptions than Larkin himself. The defendants, therefore, were parties in interest, and they were admonished to appear "for the protection of such interests." Having failed to appear, after being regularly summoned in the mode prescribed by the statute, and their default having been duly entered in pursuance of the practice of the court assuming it

to be competent to acquire jurisdiction in this mode, I do not perceive why they should not be bound by the judgment in the same manner, and to the same extent, as if they had appeared.

The plaintiff's grant is the elder grant. The judgment of the district court is, that it is properly located, as designated in the decree and embraced in the patent. The patent is intended to give effect to the grant, and it relates to the date of the grant, and over-reaches the defendants' patent and grant.

Had defendants appeared, this judgment and patent would have been conclusive upon them, unless the Rodrigues Case is to be over-ruled.

If they were bound to appear in answer to the monition to protect their rights, the result must be equally conclusive; and that they were bound to appear, I think there can be little doubt.

But suppose, in consequence of defendants not appearing, the judgment locating plaintiff's land, and the patent in pursuance of such location, are not conclusive, then it follows, under the decision in Rodrigues' Case, that neither patent is conclusive; for, if the location of Castro's grant in that case did not affect the holders of the elder grant to Sanchez, because they were not parties to the proceeding, then, for the same reason, the prior location of Fernandez's grant cannot affect the rights of plaintiff, who was not a party to their proceedings.

In that view it might be necessary to determine, anew, whether there was error in the location of the Boga rancho by the district court; for, if correctly located, the patent issued upon it being upon the elder grant, would, upon principles of the cases cited, constitute the superior title. If, as the supreme court say, the court is called upon "to determine where the grant to the present claimant ought rightfully to be located," it must be because he is entitled to have the particular land upon which it is "rightfully located"—the land which it was intended he should have when the grant was made.

Upon the question of the rightful location of the Boga grant, no facts were proved on the trial affecting it, other than such as are expressed in the findings; and upon those facts, it does not appear to me that any party uninfluenced by a desire to conform to the prior selection of the claimant, or to avoid locating the grant upon lands already assigned to another grant, would have located it otherwise than it was located by the district judge.

I have examined the opinion of the district judge, given in deciding the question of location, and the reasoning seems to me to be conclusive upon the question. The grant and diseño are so specific that little latitude is left for the exercise of discretion in the location. The diseño is by far the most accurate plat of the county embraced in it, of any diseño that has ever been brought to my notice. It is understood to have been made by General Bidwell from the map of Vioget, the principal surveyor in the country at that time. But this does not appear in the evidence. Since it is a remarkably accurate one, it is not important who made it, or from what data. The only marked inaccuracy appears to be the giving of the wrong number to the parallel of latitude laid down in the diseño. The Sutter Case throws some light on the cause of this error. The adoption in the preliminary survey of the designation of the degree, instead of the actual location of the parallel with reference to surrounding objects, by Larkin and the first surveyors engaged in making the preliminary location of the grant, doubtless gave rise to the subsequent difficulties as to the location of the respective grants. The petition of Flugge asks for a tract of land situate "on the western side of Feather river, and stretching along the said river from 39 degrees 33 minutes 45 seconds, north latitude, to 39 degrees 48 minutes 45 seconds, and forming on this line a square one league in breadth, * * * as it is rendered manifest by the annexed sketch."

The quantity of land is not mentioned in the petition, but it is asked from one line of latitude, as shown by the diseño, to the other, "one league in breadth."

The order for the grant limits the quantity to five square leagues, "its first boundary to be from 39 degrees 33 minutes 45 seconds, northern latitude;" and the formal grant is for five square leagues on the western side of Feather river; "the first boundary to be from 39 degrees 33 seconds, 45 minutes, as the respective sketch explains," in the language of one translation, or of another, "having its first boundary from latitude 39 degrees 33 minutes 45 seconds north, as appears from the corresponding plan." The northern boundary is not indicated, either in the order or grant.

It was manifestly intended to adopt the parallel of latitude, as it was laid down on the diseño. The decree of confirmation, also, directs the land to be "located in accordance with the calls of the grant, and the boundaries as delineated on the map accompanying the espediente to which reference is made. The southern boundary line indicated on the said map by the line marked 39 degrees 33 minutes 45 seconds; and the northern boundary by the line marked 39 degrees 48 minutes 45 seconds, north latitude," etc. Thus, according to the grant, the "first boundary," that is the southern line of the land granted, is to be the parallel 39 degrees 33 minutes 45 seconds, as laid down on that map; that is to say, the line so designated on the plat, but, as it is thus located, the northern line is not mentioned. Feather river is to be the eastern boundary. Two boundaries are, then, determined. The petition asks that the land may be one league in breadth, and this is generally regarded as allowed, when nothing

is said in the grant to the contrary. The land is then limited to five square leagues, which would require the tract to be five leagues in length to make the quantity. It is only necessary to find the point on the river, where the line, as laid down on the map, crosses it, and project the parallel from that point, to obtain the southern boundary, and we then have all the elements to make a certain location.

Few Spanish grants point out the land intended to be granted with so much certainty as this one. It admits of but one general location, unless the "first boundary" is wholly abandoned, and this cannot rightfully be discarded, either under the grant or decree. If this boundary can be properly located on the land, then upon the principle of the maxim, "Id certum est quod certum reddi potest," the location is certain; for it will be a tract of land having the parallel as located for its southern, and Feather river as its eastern boundary, and be one league in width and five leagues long, and that tract can occupy but one general location. This comes very near being the grant of a specific tract. As held in Fossat's Case, there is "no sobrante here," where two lines are given, and the data for finding the others. 2 Wall. [69 U. S.] 715, 716.

By an examination of the diseño, it will be seen that the Sacramento, Feather and Yuba rivers, Arroyo de Honcut and Los Picos, all well-known and striking physical landmarks, are very accurately laid down, as well as a very large number of particular, and less prominent objects; and the parallel "marked 39 degrees 33 minutes 45 seconds," and the Boga rancho, located with reference to these objects. By comparing this diseño with the plat of Feather river and the Boga rancho, as finally located and patented, constructed from actual survey, it will be seen, on following the line of the river, laid down on both, that the same bends in the river are found in the corresponding plats, and that the southern line in the actual survey of the rancho, as finally located, is drawn just below a bend in the river corresponding with a similar bend on the diseño, immediately below which, in a corresponding position, the parallel marked "39 degrees 33 minutes 45 seconds," is drawn. So, also, the Arroyo de Honcut, or Honcut creek, is found on the opposite side of the river, in the same relative position with reference to the southern line on both plats, the said creek flowing into Feather river about the same apparent distance from the southern line as indicated on both plats—the plat of the survey as finally located, and the diseño. So far as I am able to judge, therefore, from the two plats, the southern line is located by the final decree, in the same position as on the diseño. It is plain, also, by mere mathematical calculation, that there is but one quarter of a degree (15 minutes) in latitude embraced in the diseño to the Boga rancho; and, since

the tract embraced in it is but one league in breadth, there is not enough land within the diseño to satisfy the two grants, five leagues for the Boga, and four for the Fernandez grant—nine leagues in all—and that the Fernandez grant could not be located within that diseño without necessarily interfering with the Boga grant, supposing the southern line of the Boga grant to have been correctly located. It is true, that one witness testified generally, that there was enough land within the diseño to satisfy both grants, but this was, manifestly, on an erroneous hypothesis as to the location of the designated parallels. Conceding the southern line of the Boga ranch, as finally surveyed, to be correctly located, it seems manifest, that it would be impossible to locate that grant within the territory embraced in the diseño, without embracing a portion of the Fernandez grant, as patented.

The defendants' counsel have assumed, in their argument, that the southern boundary of the Boga grant is coincident with the northern boundary of the Sutter grant, and that the northern boundary of the Sutter grant is one league below the southern line of the Boga grant, as finally located, and coincident with the southern line of that rancho, as located on the plat which was first ordered into court, and afterward set aside. But the Sutter tract, or line, is nowhere mentioned in the petition, grant, diseño or decree, in the case of the Boga grant. It is not one of the calls, either of the grant or decree. So far as I am able to determine the question from the proofs made on the trial of the case, the final decree of the district court locating the Boga grant, locates it in strict accordance with the calls of the grant, and of the decree of confirmation. And I do not see that it could have been located in any other way, without violating the calls of the grant and decree, unless by a somewhat strained construction, the location should be extended the entire length of the diseño, from the southern line, as actually located, one quarter of a degree north, to the other line laid down on the diseño, marked 39 degrees 48 minutes 45 seconds, diminishing the breadth so as to include only five leagues. But, this, I think, would, manifestly, not be to carry out the intent of the grant or decree; besides, it would embrace much more of the Fernandez rancho than it does as now located. The only other location that could be considered, would be to adopt the true location of the parallels of latitude as designated by the numbers, as was done in the first survey. But this is manifestly inadmissible, as no part of it would then be within the territory laid down on the diseño.

If, then, the question of location could be considered as open to examination, as between the parties to this action, I should still, upon the case as presented, be compelled to hold that the Boga grant is lo-

cated in strict accordance with the calls of the grant, and decree of confirmation. And it does not appear to me to be susceptible of any location within the calls of the grant, or decree of confirmation, as indicated by the diseño, that would not necessarily include a considerable portion of the Fernandez grant as located and patented. But, as before stated, in view of the present state of the authorities, I do not regard the question of location as now open. I think the action of the district court conclusive.

It is further said that the note and stipulation as to third parties in the patent to the Boga rancho, in effect excepts the land to the extent of the interference. But it is, plainly, not an exception of the land. It merely states the fact of the interference, and says in virtue of the act of [March 3] 1851, the patent shall not affect the interest of "third persons," and, "consequently, shall not affect any valid adverse right, if such exists, to such portion of the land as may be covered by the Fernandez rancho, patented as aforesaid," without assuming to determine whether there was any valid adverse right, or to except the land from the patent. The Fernandez patent contains a similar stipulation as to the rights of "third persons," and, if the clause in the Boga patent can be regarded as an exception, the same must be said of the clause in the Fernandez patent. Neither is an exception of the land, but only of any adverse right in the lands, if any there is.

There can be no doubt, I apprehend, that any party acquiring an interest in land from the United States, subsequent to the presentation of a claim under a Spanish or Mexican grant for confirmation, would be concluded by the proceedings, not merely on the principle of the doctrine of relation, as suggested in a number of cases, but also upon the principle that every one who acquires an interest in the subject-matter of the litigation from one of the parties to it, pendente lite, takes it subject to the result of the litigation, and is estopped from again contesting the matter. It may be that this principle, in respect to Mexican grants, may carry the estoppel back to the date of the treaty, so as to apply to all interests acquired from the United States after the nation became the proprietor of the public domain of California; for the United States, themselves, covenanted to protect the interests of Mexican grantees, not to turn them over to be litigated with individual citizens, as assignees of the United States; and the contest between the claimant and the United States may, in a certain sense, for that purpose, be regarded as initiated, or as existing in an inchoate state from the date of the treaty. If so, these parties would take any interest from the government, with the understanding in contemplation of the treaty and public law, that the rights of the claimants under the United States should be represented by the

government in the contests to arise under such laws as should be enacted in pursuance of the treaty for procuring a confirmation of existing grants, and be concluded as being in privity with the United States in the proceeding.

The right of grantees under the Mexican government to have their titles ascertained and protected, attached at the date of the treaty. Time was required to provide tribunals, and a mode of proceeding to adjudicate their rights.

Provision was made at an early date to carry out the obligations of the treaty by the act of 1851, and two years were given within which to present claims. It was not contemplated that there should be a race, or a scramble, for the first confirmation, or that one who should be the most expeditious, or find the fewest obstacles to overcome, or be able to throw the most obstacles in the way of his adversary, should thereby gain an unjust priority. It was, on the contrary, designed that each claimant, pursuing his right within the time allowed, should have that which justly belonged to him, whether early or late at the goal of the contest.

I see no good reason, therefore, why, when a claim has once been presented within the time allowed, the presentation should not be regarded as relating to the date of the treaty, when the obligation on the part of the United States attached, and all stand in this particular upon a common footing. The United States assumes the obligation at that point of time, and from that moment the proceeding may well be regarded as in esse, so far as that all parties subsequently acquiring interests from the United States should be bound by the result, leaving the rights of conflicting claimants under confirmed Mexican grants to be determined in the tribunals of the country, in the first proceeding wherein both parties have an opportunity to be heard according to the rights and equities, as they actually existed at the date of the treaty.

But, whatever the principle upon which the conclusions rest, so far as Mexican grants in California, and the treaty and acts of congress especially applicable thereto are concerned, the results indicated appear to me to be clearly deducible from the authorities, as they now stand.

I have examined a large number of cases decided by the supreme court of this state, and of the United States, and endeavored to extract therefrom the principles thus far settled, bearing upon the questions at issue, and to apply them to the facts of this case without advancing any theories of my own. If I have not misapprehended the decisions, they furnish principles either expressly determined, or clearly foreshadowed, sufficient to indicate the judgment that should be entered. But if I have erred in my conception of the law, as laid down by the supreme court, or in the opinions which I have

been called upon to consider, of any of the learned judges now constituting that court, I shall, doubtless, be set right upon a review of the case on writ of error. After giving the case the best consideration I am able to bestow upon it, the following conclusions have been attained:

First—That the plaintiff's cause of action is not barred by the statute of limitations.

Second—That the selection, by Larkin, of the tract as located by the preliminary survey, and by the first survey made after the decree of confirmation became final; his claim of the tract so selected, as the land granted to Flugge, and his acts relating thereto, do not estop said Larkin, or those deriving title through him, from now claiming the land as finally located by the district court and patented.

Third—That the fact that the Fernandez grant was first presented for confirmation, and was first finally surveyed and patented, is not conclusive evidence of title, as against the claimants under the Boga grant.

Fourth—that the holders of the Boga grant, it being the elder grant first finally confirmed, with boundaries, both in the grant and decree of confirmation, so definitely described as to admit of but little variation in the location, and it having been finally located and patented so as to include a portion of the land covered by the patent issued under the Fernandez grant, are "third persons" with respect to the Fernandez grant, within the meaning of the fifteenth section of the act of [March 3] 1851, and they are not concluded by the prior final location and patent of said latter grant.

Fifth—That the survey of the Boga grant having been made and approved by the surveyor-general of California, and returned into the district court, by order of said court, and proceedings for the purpose of contesting and reforming the same being pending in said court, at the date of the passage of the act of congress of June 14, 1860, relating to the subject, the said district court had jurisdiction under said act, to revise said survey, and determine by its judgment or decree, the true location of said grant.

Sixth—That since the exceptions filed to said survey directly affected the interests of the claimants under the Fernandez grant, said claimants were parties in interest, who were authorized and required by the provisions of said act, upon due notice, to "intervene for the protection of such interest."

Seventh—That due notice, admonishing all parties in interest to appear for the protection of their interests, having been given, in accordance with the provisions of said act, and the rules and practice of said court, and the said claimants under the Fernandez grant having failed to appear, and the de-

fault of all parties who did not appear having been duly entered in pursuance of the rules and practice of said court, the said claimants are bound by said proceedings in the same manner and to the same extent, as they would have been bound had they intervened in said proceeding.

Eighth—That said proceedings are judicial in their nature, and are conclusive upon the parties in interest appearing, or who, being duly admonished, fail to appear, but make default, and their privies, and the proceedings in this case are conclusive upon the defendants, as to the true location of the Boga grant.

Ninth—That the Boga grant being the elder grant, and being correctly located in accordance with the calls of the grant, and decree of confirmation, the patent is evidence of title from the date of the grant.

Tenth—That at the date of commencement of this action, the plaintiff, by title derived from Thomas O. Larkin, the patentee of the Boga grant, was seized in fee, of an undivided three-fourths part of the premises described in the complaint.

Eleventh—That the defendants had no title, as against the patentees of the Boga grant, and as against said patentees, were in the wrongful possession of said premises, and they wrongfully and unlawfully withhold the same from the plaintiff.

Twelfth—That said plaintiff is entitled to judgment for possession of said premises, and for his costs of suit.

Let judgment be entered for plaintiff for possession of the premises described in the complaint, and for costs of suit.

[NOTE. Affirmed by the supreme court in Henshaw v. Bissell, 18 Wall. (85 U. S.) 255, on the grounds, with others, that, whether or not the grant by the governor of California to Fernandez be treated as one of specific boundaries or of quantity, it could not interfere with and displace the prior grant to Flugge, notwithstanding that it was first surveyed and patented; that the confirmation did not change the character of the grant to Flugge as one of specific boundary, nor that to the Fernandez as one of quantity; that the survey of the Flugge claim under Act June 14, 1860, and the proceedings of the district court therein, made the Flugge grant conclusive as to all adverse claimants under floating grants; that it was no objection to the authority of the district court that the cause was ordered therein before the act went into effect; and that it was immaterial that a different survey had been previously approved by the governor of California; further, that, the present action having been commenced within the time designated after final confirmation of the grant, and before the repeal of the state statute of limitations, it was not barred; that the statute did not run against the plaintiffs while the proceedings for the confirmation of the Flugge claim were pending; and that plaintiffs were not estopped by the fact that Larkin had previously erroneously located the Flugge tract, and had announced that his claim covered the land selected.]